SUSAN M. CHEHARDY, Judge.
2On appeal, defendant seeks review of his convictions and sentences for aggravated battery and false imprisonment with a deadly weapon. For the following reasons, we affirm his convictions and sentences.
On December 7, 2007, the Jefferson Parish District Attorney’s Office charged the defendant, Eric Williams, Sr., with one count of forcible rape, in violation of La. R.S. 14:42; one count of aggravated battery, in violation of La. R.S. 14:34; and one count of false imprisonment while armed with a dangerous weapon, in violation of La. R.S. 14:46.1.
The matter proceeded to trial before a twelve-person jury. On April 28, 2010, the jury found defendant guilty as charged for aggravated battery and false imprisonment while armed with a dangerous weapon. However, the jury deadlocked on the forcible rape charge. The State subsequently opted not to retry the defendant for forcible rape.
On May 10, 2010, the trial court sentenced defendant to eight years at hard labor for aggravated battery and eight years at hard labor for false imprisonment while armed with a dangerous weapon, to be served consecutively. The defendant filed a motion to reconsider sentence, which was denied. This appeal follows.

3Facts

M.W.,[1] the victim and the wife of the defendant, testified that, in 2010, she had been married to the defendant approximately 25 years. According to the victim, the defendant knew that she had plans to divorce him.
The victim testified that, in the early morning hours of September 9, 2007, she and the defendant, who were at their home in Harvey, got into an argument after she refused to have sex with the defendant. The defendant cursed her and placed a “knife at [her] throat.” The victim indicated that the defendant told her that if she screamed, he would cut her throat. The victim testified that the defendant held her at knifepoint in their bedroom from approximately 1 a.m. to 9 a.m. During that *93 time, defendant forced her to perform oral sex and raped her vaginally and anally.
Eventually, the victim attempted to disarm the defendant and screamed for her daughter to call the police. During the struggle, the defendant bit the victim on the hand. With her daughter’s help, the victim escaped to their daughter’s bedroom.
The defendant then armed himself with a large barbeque knife from the patio downstairs, returned upstairs, and broke down their daughter’s bedroom door by punching and kicking the door. The victim testified that the defendant stabbed her “through the door ... because I was holding the door.”
At trial, the victim’s and defendant’s 22-year-old daughter testified that, in the early morning hours of September 9, 2007, she heard the defendant start an argument with the victim, which was not unusual. Later, she was awakened by the victim screaming her name. When she went into the hallway that separated her bedroom from her parents’ bedroom, she heard the victim say, “Don’t, don’t, |4please stop, I’ll have sex with you if you don’t.” At that point, she went back into her bedroom. Around dawn, she was awakened a second time by the victim screaming her name and “call 911, call 911.” Their daughter also heard the victim scream that the defendant had “her by knife point.”
Their daughter immediately called 911, retrieved a “knife I had underneath my mattress ... for protection,” ran into the hallway, and attempted to open her parents’ bedroom door. She was only able to partially open the bedroom door because the defendant was blocking the door. Their daughter saw the victim holding a folding knife and the defendant holding something “like a broom handle.”
According to their daughter, the defendant stated that the victim had held him hostage all night. The victim, however, declared that the defendant had held her hostage. At that point, the victim escaped her bedroom, took their daughter into the daughter’s bedroom, and locked and barricaded the door.
As the victim spoke to the 911 operator, the defendant “started punching a hole through the door” with his fists and feet. Their daughter testified that the defendant lacerated his forearm when he was punching through the door. Their daughter stated that, when the defendant was eventually able to “put his hand through the hole and started making stabbing motions to my mom’s chest, ... he cut her on her chest.” The defendant was then able to kick in the door and enter her bedroom armed with a 20-inch long, silver barbeque knife.
Deputy Marcus Lopez of the Jefferson Parish Sheriffs Office testified that, on September 9, 2007, he was dispatched to investigate a domestic disturbance in response to a 911 call from 2548 Catawba Drive in Harvey. Deputy Lopez knocked on the front door and first floor windows of the residence but received no answer. As Deputy Lopez was making his last pass around the house, a woman ^opened an upstairs window and yelled, “Help me, Help me, he’s trying to kill me. Kick in my door.” Deputy Lopez drew his weapon, kicked in the front door, and entered the residence.
Deputy Lopez testified that after entering the Catawba Drive residence, he and Deputy Jason Picou checked the first floor for victims then proceeded upstairs. In a second-floor hallway, Deputy Lopez noticed a blood splatter and a door that was “completely disseminated, it was in pieces.”
*94 When Deputy Lopez entered the room with the damaged door, he noticed “out of the corner of [his] eye” a man, whom he identified in court as the defendant, standing in a corner of the room with a knife directly in front of a woman wearing a “blood soaked shirt.” Deputy Lopez ordered the defendant to drop the knife and to place his hands on the wall. The defendant complied. Deputy Lopez testified that the defendant then said, “it’s not me, it was her.”
When he interviewed the victim, Deputy Lopez learned that she was the defendant’s wife who told him that she was “held in her house all night by knife point and was raped several times over the course of the night.” Deputy Lopez described the victim as being “very afraid.”
At trial, Detective Lopez identified crime scene photographs of the victim on September 9, 2007. He identified photographs of a puncture wound to the victim’s breast and a bite by the defendant on her hand she sustained when she was trying to defend herself. Deputy Lopez also identified a photograph of the 20-inch long, chrome barbeque knife that the defendant was pointing at the victim when the deputies found the defendant.
Deputy Jason Aaron Picou of the Jefferson Parish Sheriffs Office testified that he was dispatched to the Catawba Drive residence to assist Deputy Lopez. When Deputy Picou arrived at the Catawba Drive residence, Deputy Lopez was | (¡standing at the front door. Deputy Picou subsequently heard “someone scream down from the top floor that they needed help and for us to get up there and to kick in the door.”
After entering the second floor bedroom, Deputy Picou observed the defendant and the victim standing on opposite sides of the room. The defendant, who had a knife in his hand, told Deputy Picou that he and his wife had an argument “over her having an affair with his eighteen-year old son’s friend,” and that his wife had stabbed him. Deputy Picou testified that the victim had a stab wound to her chest and that the defendant had a stab wound to his arm.
Sergeant Kevin Decker of the Jefferson Parish Sheriffs Office, upon his arrival at the crime scene, notified the victim that she was going to be escorted to Lakeside Hospital for medical care, including a sexual assault examination by a physician. Dr. Rachel Reitan, an expert in obstetrics and gynecology, examined the victim at Lakeside Hospital on September 9, 2007. Dr. Reitan determined that the victim had a “large stab wound [to] her left breast” and a “bite mark on her hand.”
Dr. Reitan further determined that, although the injuries were not life-threatening, the victim had “a lot of bruising up by her neck, like somebody was trying to kill her, strangle her.” According to Dr. Rei-tan, the victim’s injuries indicated “the patient had been forcefully sexually assaulted and emotionally abused with her life being threatened over and over.” Dr. Reitan indicated that prior to September 9, 2007, she had not treated the victim.
At trial, the defendant testified on his own behalf. He testified that, on the date of the attack, the victim began arguing with him after they had consensual sex. The defendant indicated that he did not want to argue with his wife in the home because his family counselor had advised against it. However, the victim kept 17arguing with the defendant. According to the defendant, the victim kept on telling him “I didn’t cheat on you” while he was trying to sleep. She then told the defendant that she was going to leave him and “take” the cash he had saved to pay the insurance deductible to get her vehicle fixed.
*95 The defendant testified that the victim then begged him to have sex with her. After the defendant acquiesced, the defendant told the victim that he wanted to go to bed. The defendant testified that the victim asked him about the deductible money, to which he responded “it don’t make sense for me to give you the money.” The defendant then went to sleep. The defendant testified he awoke to the victim “with a knife on me” telling him “come on, you going to give me my money.” The defendant indicated that he bit the victim’s hand in an effort to dislodge the knife.
According to the defendant, the commotion awoke their daughter. The defendant told their daughter that the victim was “acting like she was crazy.” He also denied that he had held his wife at knife-point. The defendant admitted breaking down their daughter’s bedroom door; he testified that he broke down the door in order to tell the 911 dispatcher that his wife was lying.
The defendant also admitted stabbing the victim in the breast. He explained that his intention was to “cut [the victim] back like [she cut him].”
On cross-examination, the defendant admitted that, on September 9, 2007, he knew right from wrong. The defendant also admitted that, during the course of his marriage, he had extramarital affairs. The defendant testified that both his wife and daughter were lying about the events of September 9, 2007. The defendant additionally admitted that he told his family counselor and a psychiatrist that he was not “crazy.”
[sThe defendant also presented testimony from Dr. Daphney Glenmeyer, who was qualified as an expert in psychiatry. Dr. Glenmeyer examined the defendant and the defendant’s mother. Dr. Glenmeyer testified that, in her medical opinion, the defendant suffered from a “delusional disorder” or a pathological jealousy, wherein the defendant believed that his wife was having an affair. According to Dr. Glen-meyer, the defendant was suffering from a “delusional disorder and that, as a result of the delusions, was unable to exercise the appropriate impulse control, had poor judgment, therefore leading toward what happened.”
On cross-examination, Dr. Glenmeyer admitted that it was possible that an individual suffering from a delusional disorder could appreciate the consequences of his actions and know right from wrong. Dr. Glenmeyer admitted that brain scans conducted on the defendant while the defendant was housed at East Jefferson Hospital were negative for any brain abnormalities.
On rebuttal by the State, Dr. Harminder Mallik was certified as an expert in the field of psychiatry and forensic psychiatry. Dr. Mallik examined the defendant on August 13, 2009, because the defendant had submitted a plea of not guilty by reason of insanity. The purpose of the examination was for Dr. Mallik to determine whether or not the defendant could distinguish between right and wrong at the time of the alleged offenses.
Dr. Mallik stated that the defendant told him he knew that rape was wrong and attempted to portray himself as the victim in this matter. After reviewing the report, Dr. Mallik described the defendant’s motive for the attack as a “sex deal gone sour.” After reviewing all relevant evidence, including his interview of the defendant, defendant’s children, the victim, and defendant’s statements to Dr. Glenmeyer and Ms. Gundy, Dr. Mallik testified that, in his medical opinion, the defendant was able to distinguish right from wrong at the time of the offenses.
*96 IflAfter hearing all the testimony and reviewing the evidence, the twelve-person jury found defendant guilty as charged of aggravated battery and false imprisonment with a deadly weapon but could not reach a verdict on forcible rape. On appeal, defendant raises two assignments of error: first, the evidence was insufficient to convict him of aggravated battery and false imprisonment and, second, his sentences are excessive.
In his first assignment of error, defendant contends that the evidence used to convict him at trial was legally insufficient because he “met his burden of proving by a preponderance of the evidence that he was insane at the time of this crime.” Specifically, defendant does not challenge the sufficiency of evidence used to convict him of aggravated battery or false imprisonment but rather contends that he proved, by a preponderance of evidence, that he did not have to ability to distinguish right from wrong at the time of the offenses.
In Louisiana, a defendant is presumed to be sane. La. R.S. 15:432; State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 32; State v. Washington, 00-301 (La.App. 5 Cir. 9/26/00), 769 So.2d 1235, 1238, writs denied, 00-2971 (La.9/28/01), 798 So.2d 106, 00-3041 (La.9/28/01), 798 So.2d 108. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden under La.C.Cr.P. art. 652 of proving the affirmative defense of insanity by a preponderance of the evidence.
Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted from criminal responsibility, the defendant must show he suffered a mental disease or defect which prevented him from distinguishing between right and wrong at the time he
committed the conduct in question. La. R.S. 14:14; Silman, 663 So.2d at 32.
[ lflThe determination of sanity is a factual matter. Silman, 663 So.2d at 32. A Louisiana jury considering an accused’s plea of not guilty and not guilty by reason of insanity must first determine whether the State has proven the essential elements of the charged offense beyond a reasonable doubt. It may then proceed to the determination of whether the defendant was incapable of distinguishing between right and wrong at the time of the offense, and is thus exempt from criminal responsibility for his actions. State v. Branch, 99-1484 (La.3/17/00), 759 So.2d 31, 32 (per curiam).
All evidence, including both expert and lay testimony, along with defendant’s conduct and actions before and after the crime, may be considered in determining whether the defendant has met his burden of proof. On review of a claim for sufficiency of evidence in an action where an insanity defense has been raised, the appellate court, applying the standard outlined in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence in a light most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. Silman, 663 So.2d at 32.
 If there is conflicting evidence on the issue of insanity, the reviewing court should accord great weight to the jury’s resolution of the conflicting evidence provided the jury was properly instructed and no evidence was prejudicially admitted or excluded. State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir.1984), writ denied *97 456 So.2d 171 (La.1984). The jury’s decision should not be overturned unless no rational juror could have found the defendant failed to prove his insanity at the time of the offense. State v. Sharp, 418 So.2d 1344 (La.1982); State v. Moore, 568 So.2d 612, 618 (La.App. 4 Cir.1990)
|nIn this case, both the prosecution and the defendant presented testimony from witnesses, including expert psychiatrists, Dr. Glenmeyer and Dr. Mallik, regarding defendant’s ability to distinguish right from wrong at the time of the incidents in question. Dr. Glenmeyer based her opinion that the defendant was insane at the time of the offenses largely upon notes made by the admitting physician at East Jefferson Hospital’s behavioral psychiatric ward. According to Dr. Glenmeyer, the admitting psychiatrist diagnosed defendant as “psychotic” and “delusional” upon his admission in July 2007.
Dr. Glenmeyer further opined that the defendant suffered from a “serious mental illness” and “would be unable to moderate his impulses, to appreciate the consequences of his actions, period.” However, on cross-examination, Dr. Glenmeyer admitted that some individuals with delusional disorders could possibly appreciate the consequences of their actions and know right from wrong.
Conversely, Dr. Mallik testified that after reviewing all relevant evidence, it was his medical opinion that the defendant was able to distinguish right from wrong at the time of the offenses. Dr. Mallik also pointed out several discrepancies in Dr. Glenmeyer’s testimony. He characterized Dr. Glenmeyer’s testimony regarding defendant’s psychiatric hospitalization, that the defendant “came in and he was psychotic and was treated with medications and got better,” as “not the case.”
Dr. Mallik pointed out that terms “psychotic” and “delusional” as found in the records from East Jefferson were used by defendant’s family to describe defendant, not listed as a diagnosis. Further, the defendant was treated with one dose of anti-depressant medication for sleeplessness during his inpatient treatment. He did not receive anti-psychotic medications at any time during his hospitalization at East Jefferson. Defendant was released with a diagnosis of major 112depressive disorder with therapeutic follow-up with a social worker not a physician, which suggests that defendant did not need medication to treat his disorder.
The defendant’s testimony and actions also lend credence to the jury’s determination that he was not insane at the time of the offenses. Most importantly, the defendant testified at trial that he knew right from wrong at the time of the offenses. The defendant stated to Dr. Mallik that he knew right from wrong at the time of the offenses and that he knew that committing rape was wrong. The defendant clearly attempted to portray himself as a victim of his wife’s actions at trial.
Considering the totality of the evidence, and viewing the evidence as most favorable to the prosecution, we find that a rational jury could easily have concluded the defendant failed to prove, by a preponderance of the evidence, his insanity at the time of the offense. We find that this argument lacks merit.
In his second assignment of error, the defendant argues that his sentences were excessive. Specifically, the defendant contends that the acts that lead to his convictions were all part of one incident so the trial judge erred in imposing consecutive sentences for his crimes.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. *98 Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the 113harm done to society, it shocks the sense of justice. State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
When an appellate court reviews a sentence for excessiveness, the issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Pearson, 07-332 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. Id.
Consecutive and concurrent sentences are governed by La.C.Cr.P. art. 883, which states:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment are to be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
Here, the defendant was convicted of aggravated battery and false imprisonment while armed with a dangerous weapon. La. R.S. 14:34 provides that “[w]hoever commits an aggravated battery shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than ten years, or both.” La. R.S. 14:46.1(B) provides that “[w]hoever commits the crime of false imprisonment while armed with a dangerous weapon shall be imprisoned, with or without hard labor, for not more than ten years.” The defendant was sentenced to eight years at hard labor on the aggravated battery conviction and | Height years at hard labor on the false imprisonment while armed with a dangerous weapon conviction, to run consecutively.
In sentencing the defendant, the trial court stated, in pertinent part:
I’ve considered the guidelines of 894.1 of the Code of Criminal Procedure when deciding your sentence ... what I find very compelling is the fact that you accept no responsibility for your actions, that this was all a charade, an act put on by your wife ... the facts of this case are particularly horrendous ... you kept your wife imprisoned while armed with a knife for seven hours, for seven hours ... you wanted to show her what it was like to be cut ... Anyone that may review my sentence, I strongly suggest that they listen to the 911 tape. The 911 tape in and of itself, was chilling ... the terror in her voice as you were cutting through the door is something I’ve never heard of in all the years that I’ve been doing this type of work ... I will reemphasize the fact that the stabbing occurred to her chest with a weapon that was significant in size ... I do *99 want the record to reflect that with the aggravated battery after she broke free from you and attempted to barricade herself into her daughter’s room, you went downstairs and retrieved a barbeque knife for which she was stabbed ... because the two crimes are separate and distinct, they are to run consecutive to one another.
In State v. Walker, 00-3200 (La.10/12/01), 799 So.2d 461, 462 (per curiam), the Louisiana Supreme Court stated, however, that:
Although La.C.Cr.P. art. 883 favors imposition of concurrent sentences for crimes committed as part of the same transaction or series of transactions, a trial court retains the discretion to impose consecutive penalties in cases in which the ... circumstances in his background or in the commission of the crimes justify treating him as a grave risk to the safety of the community.
See also, State v. Scott, 06-1103 (La.App. 1 Cir. 12/28/06), 952 So.2d 60, 68-70 (consecutive sentences were warranted where the recidivist defendant’s unprovoked, brutal attack manifested deliberate cruelty, caused significant injury to the victim’s face, and created a risk of bodily harm to more than one person); State v. Jones, 04-1524, p. 5 (La.App. 1 Cir. 3/24/05), 907 So.2d 139, 143 (“Additionally, given the obvious danger Imposed to the public by the defendant’s repeated drunken driving, consecutive sentences were justified in this case.”)
In the instant case, the trial judge found that the criminal acts were separate incidents and .imposed consecutive sentences. We find no error in that decision. Further, even if the defendant’s acts were part of the same transaction or series of transactions, a trial court retains discretion to impose consecutive penalties in cases, such as this, in which the defendant’s background or his actions during the crimes justify treating him as a grave risk to the safety of the community. Here, defendant imprisoned his wife for many hours at knifepoint while their daughter slept across the hall, threatened her life and their children’s lives, coerced sexual intercourse, then upon her escape, re-armed himself with a larger knife from an outdoor area, broke down a door with his bare hands, stabbed his wife in the chest in front of his daughter, and threatened his daughter with the same knife.
As the sentencing court correctly concluded, the defendant presents a grave risk to his family and the safety of the community. Further, the trial court exceeded in his compliance with La.C.Cr.P. art. 894.1(C). Upon thorough review, we find no abuse of discretion in the trial judge’s imposition of consecutive sentences. This assignment of error lacks merit.
Finally, as is our customary practice, we have reviewed the record for errors patent, pursuant to La.C.Cr.P. art. 920. We note that neither the transcript nor the commitmenVminute entry indicates that the jury was sworn as required by La.C.Cr.P. arts. 788 and 790. Jury irregularities were not, however, raised in the trial court or on appeal. Consideration of that issue is, therefore, waived. More importantly, we find no prejudicial error. See, State v. Bauman, 08-1169 (La.App. 5 Cir. 5/12/09), 15 So.3d 177, 187; State v. Wilkinson, 00-339 (La.App. 5 Cir. 10/18/00), 772 So.2d 758, 771. No corrective action is required.
11fiIn conclusion, we find no merit in defendant’s arguments on appeal. Defendant’s convictions and sentences are hereby affirmed.

AFFIRMED

. In an attempt to protect the victim’s privacy, we will refer to the victim using her initials. See, La. R.S. 46:1844(w).