LOLLEY, J.
11This 'criminal appeal arises from the 26th Judicial District Court, Parish of Bossier, State of Louisiana. The defendant, Christopher Wayne Holder, was convicted of the second degree murder of his mother,- a violation of La. R.S. 14:30.1. Christopher was sentenced to life imprisonment at hard labor, without the benefit of probation, parole, -or suspension of sentence. *922 Christopher appeals his conviction and sentence, which, for the following reasons, are affirmed.
Facts
On November 18, 2011, Dr. Donna Holder was stabbed to death in her home. That evening Christopher Holder placed a 911 call from the home he shared with his mother, reporting that Dr. Holder had been stabbed by an intruder. Officers immediately responded to the scene and located Christopher, who appeared to be covered in blood. Later, an autopsy of Dr. Holder by Dr. James Traylor, the director of Autopsy and Forensic Services at LSU Health Sciences Center of Shreveport (“LSU-HSC”), confirmed that she died as a result of multiple stab wounds and that her body also displayed defensive wounds. Dr. Traylor identified 43 stab wounds, 17 slash wounds, and approximately 32 superficial incisions. He located a complete knife that was lodged in the left chest cavity.
Detective Kevin Little testified that, after searching the house and interviewing neighbors, officers at the scene came to believe that there was no intruder. At the scene, Christopher was placed in handcuffs, read his Miranda rights, and held outside the house. He was transported to the Bossier City police station. Corporal B.J. Sanford conducted a recorded | ¡Interview of Christopher approximately 1½-2 hours after the 911 call was placed, at 9:30 p.m. Corporal Sanford testified that, prior to the interview, Christopher was read his Miranda rights and signed a card acknowledging the recitation of rights.
Christopher filed a motion for the appointment of a sanity commission, owing to his recorded history of mental illness and commitments. Christopher ultimately was indicted for second degree murder, in violation of La. R.S. 14:30.1. A sanity commission, composed of two physicians, was appointed by the trial court. It ruled, based upon the reports provided by the sanity commission, that Christopher was competent to stand trial. He was formally arraigned on May 14, 2013, and entered the duel plea of not guilty and not guilty by reason of insanity.
On April 22, 2013, the state provided notice of its intent to introduce Christopher’s confession into evidence, and in response, he filed a motion to suppress and motion in limine. He argued that, despite knowledge of his history of mental illness, officers conducted an “aggressive, physically threatening and intimidating custodial interrogation” which resulted in a confession. He further argued that, because he was not provided with an attorney upon request, the statement was unconstitutionally obtained and should be suppressed. The motions also listed numerous items seized from the scene in the three hours before the police obtained the search warrant. Christopher argued that, because the items were seized without a warrant, they should be suppressed. It was asserted that, although the 911 call ^implied a consent to search, the excessive lapse of time and Christopher’s known mental illness made the warrantless search unreasonable.
A thorough hearing on the motions, which included expert medical testimony, was held. The trial court denied the motion to suppress, finding that the officers followed proper protocol in obtaining a search warrant and seizing items from the crime scene. As to the motion in limine, the trial court noted that no physician tested for whether Christopher’s statement was made knowingly and voluntarily. The trial court concluded, based upon the testimony of the officers and physicians, that Christopher’s statement was made freely and voluntarily and was admissible. The motion in limine was denied.
*923 ' Initially, Christopher elected to be tried by jury, but later filed a motion requesting he be tried by judge. After a hearing on that motion, the trial court denied the motion as untimely. Christopher made no objection to the trial court’s holding.
The jury trial commenced. During the six-day trial, the defensé called numerous lay and expert witnesses regarding Christopher’s mental status.

Lay Witness Testimony

Ann Watson, Dr. Holder’s aunt, testified that she cared for Christopher as a child while Dr. Holder and her husband, Gary, worked. She often drove Christopher to physician appointments. She recalled that Christopher was prescribed medications which she began administering when Christopher was 14 years old. She testified to instances when he was reluctant to take the medications, stating that “many times we thought he 14was taking it and he wasn’t.” Two weeks prior to her murder, Dr. Holder told Ms. Watson that she believed Christopher was not taking his medication and she intended to admit him to LSU, which Christopher opposed. Ms. Watson described Christopher as “agitated” on the day of the murder but admitted that she had never witnessed him to be violent.
Karen Diehl, Christopher’s high school guidance counselor, testified that Christopher began exhibiting agitation in the 10th grade and was often unable to remain in class. Diehl, a licensed professional counselor, testified that Christopher reported auditory hallucinations, and she explained to him that he could be treated.
Rick Brown, owner of the gym where Christopher worked out, testified that he noticed changes in Christopher’s demeanor when he turned 14 or 15 years old. Brown testified that two days prior to the murder Christopher reported hearing voices but maintained that he was taking the proper medications. Officer Russell Engi described an “isolated incident” in which Christopher had an outburst over someone elsé using a machine at the gym.
Dr. Karen Branham, an anesthesiologist and friend of Dr. Holder, recalled an incident when Dr. Holder had to report to the emergency room because.Christopher was being admitted as a danger to himself. Dr. Holder confided in Dr. Branham that Christopher suffered difficulties when not on his medication. Following his parents’ divorce, Christopher did not stay with his father often because Gary Holder would “not keep him for long.” Dr. Branham testified that Gary did not believe that his son needed to be on | ^medication. At one point, Dr. Holder had to get a court order to force Christopher to take his medication. Dr. Branham presented emails from Dr; Holder detailing Christopher’s struggles and refusal -to take medication. Dr. Branham testified that the week of her murder, Dr. Holder expressed anxiety regarding Christopher’s noncompliance and her intent to place him in a group home.
Gary Holder admitted that the issue of whether to medicate Christopher was a large part of his divorce from Dr. Holder. He testified that he was conducting independent research on physicians, treatments, medicines, and mental 'illnesses, and was merely providing that research to Dr. Holder. He stated that the divorce was handled by the attorneys and could not recall ever going to court, but admitted that the divorce was contentious due to the medications that Christopher was taking. Gary was unable to name one physician who he believed was properly treating his son.
Gary described an incident on December 8, 2009, when Christopher requested that he be taken to a dentist so that he could have a tooth pulled, Christopher did not *924 appear to be taking his medication at that time. The dentist informed Christopher that the tooth did not need to be removed and Christopher went “berserk,” as related by Gary. He took Christopher home to Dr. Holder’s house. The next day Christopher arrived at his father’s house, sat down, and began reading aloud from the Bible. Gary asked Christopher to leave, but Christopher only got 'louder. Gary went to the kitchen, and when he returned to the living room, Christopher charged at Ifihim. Although Gary testified that he had never seen his son behave violently before, Christopher kicked his father in the chest and struck him in the face. Christopher picked up a letter opener, then “snapped out of it,” began crying, and ran from the house. After speaking with Dr. Holder, Gary agreed to take Christopher to LSU, but Christopher refused. Gary called Dr.. Quinn Nyman at Hummer Grove Baptist Church, who helped convince Christopher to go to the hospital. A coroner’s emergency certificate was signed on December 6, 2009.[1] ■
This incident was confirmed by Ray Thompson,, a neighbor of the Holders, who testified that he . spoke with Christopher and his father, outside Gary’s home that day. It was apparent to Thompson that Gary had been struck in the face, he inferred, by Christopher.
Susan Tousignant, another neighbor, testified to an incident on January 15, 2011, in which Christopher exposed himself in his driveway and was removed by police.
Deputy Coroner William Fields testified that, on January 15, 2011, Dr. Holder reported that Christopher would not take his medications, was out of control, and that she was afraid of him. Fields issued an order for protective custody and the matter was turned over to Bossier City police. Officer Nick Schaefer testified that, when he responded to the call on January 15, he was , informed of Christopher’s history of mental illness. Gary and Dr. Holder reported to him that Christopher was bipolar and could be very violent. Dr. Holder reported that Christopher had broken his ^father’s nose a few months before. Christopher was transported to LSU-HSC for a psychiatric evaluation. A coroner’s emergency certificate was signed on January 16, 2011'.
Officer Schaefer testified that he responded to another call from the Holder residence on April 16, 2011. On that occasion, Chx-istopher called 911 to report that his mother had molested him as a child. Dr. Holder reported to Off. Schaefer that she believed Christopher had stopped taking his medication. She also informed him that Christopher had a history of violent outbursts, and she had installed a deadbolt on the inside of her bedroom door for protection. Based upon Off. Schaefer’s observations of Christopher having a “glazed look in his eyes” and rambling incoherently, officers decided to take Christopher for another psychiatric evaluation. Christopher did not resist. Another coroner’s emergency certificate was signed on April 19, 2011.

Medical Witness Testimony

Dr. Juliana Fort, a psychiatrist, testified that she saw Christopher at LSU-HSC once or twice when he was 15 years old, in August 2006. She recalled that Christopher reported being obsessed with whether he would kill himself and that he was having violent thoughts. She prescribed antipsychotic and anti-anxiety medications.
*925 Dr. Michael Davenport, a clinical, psychologist, testified that Christopher was referred to him in August 2006 by Dr. Fort for. a possible anxiety disorder. Christopher was diagnosed with an adjustment disorder with mixed anxiety and depressed mood, and displayed features of a panic 1 sdisorder, all of which he believed could improve over time. It was Dr. Davenport’s opinion that Christopher needed some type of intervention at that time, such as medication and/or counseling.
Dr. Gregory Brown, a psychiatrist, testified that on Septetaber 14, 2006, Christopher was admitted to Brentwood Hosptial, with a diagnosis of bipolar disorder. At Brentwood, Christopher was treated by Dr. Brown, who prescribed antipsychotic drugs. Dr. Tom Staats, a clinical neurop-sychologist, performed testing, which confirmed the diagnosis of -bipolar disorder with psychotic features. According to Dr. Staats, Christopher would have frightening auditory hallucinations. Christopher was discharged on September 26, 2006, and two days later, Melissa Thomas, licensed professional counselor, began treating Christopher at the referral of Dr. Brown. She testified that Christopher often believed others could read his thoughts based upon hand or facial movements. Christopher was prescribed antipsychotic medications and was readmitted to Brent-wood Hospital on September 29. At that time, Christopher was anxious and believed that he could read other people’s minds. Dr. Brown testified that Gary Holder did not believe the diagnosis of bipolar disorder and that Christopher’s psychotic symptoms were much worse when unmedicated. According to Dr. Brown, Christopher was discharged on October 9, 2006, but remained on a day treatment program. On February 27, 2008, Dr. Brown noted homicidal ideations. ■ Christopher continued to deteriorate due to the failure to take medications. His last appointment with Dr. Brown was March 4, 2008.
IbMs. Thomas met with the Holders in November 2006, at which time Gary Holder expressed that he wanted to take his son off all medications and did not believe that Christopher had bipolar' disorder. Around the time of his parents’ divorce in early 2007, Christopher continued to have suicidal thoughts, paranoia,-anxiety, and depression. Although Christopher improved, reporting no hallucinations, he1 still had some- suicidal thoughts. Additional testing and second opinions in the fall of 2007 confirmed the diagnosis of bipolar disorder. Counseling with Ms. Thomas abruptly ended on January 25, 2008. Christopher then stopped taking medications and his suicidal thoughts intensified. He began to have auditory hallucinations and paranoia again.1 \
Dr. Lee Stevens; a child psychiatrist; also treated Christopher and testified at trial. He noted that Christopher was again hospitalized for acute psychosis, and he appeared “quite psychotic.” Dr. Stevens issued a working diagnosis of schizo-phrenoform. An antipsychotic medication was prescribed but was immediately discontinued on Gary’s .order. Dr. Stevens testified that Christopher “needed to be on ... anti-psychotic” medication.. Ón June 27, 2009, Christopher reported auditory hallucinations and later appeared to respond to internal stimulation. By July 7, 2009, Christopher was more compliant and admitted that he needed help, but refused to eat or drink. He was discharged and referred to outpatient care at LSU with a diagnosis of bipolar disorder with acute psychosis.
| ^Christopher was first seen by Dr. Richard Williams, a psychiatrist, on August 5, 2009. Initially, he told Dr. Williams that he Fad never had auditory *926 hallucinations, suicidal thoughts, thoughts of harming others, or delusions. Dr. Williams diagnosed Christopher with generalized anxiety disorder, ruling out psychotic disorder. In the presence of his father, Christopher reported that he believed the medications caused his symptoms. He admitted to suicidal thoughts, but had made a contract with his father not to commit suicide. After reviewing Christopher’s medical records, Dr. Williams suspected schizoaffective disorder. He noted that, following Christopher’s first inpatient admission at LSU, Christopher expressed a belief that his mother was an imposter, a rare and serious delusional condition known as Capgras syndrome. Dr. Williams testified that schizophrenia is a disorder of thought and that it must be medicated, or it will not improve. Dr. Williams noted that on numerous occasions, Gary Holder reported that he did not believe Christopher needed to be on medication, and that he wanted his son to be weaned off all medications.
Dr. Sarah Wakefield, a psychiatrist, testified that Christopher was admitted to the psychiatric crisis unit at LSU on December 4, 2009, after his violent incident with Gary. Dr. Wakefield testified that Christopher was given injections, which served to relax and sedate him. She believed Christopher to be a danger to himself and others, because his behavior at the times was combative, hostile, uncooperative, and violent. Dr. Holder reported to her a history of visual hallucinations and impul-sivity, which Dr. Wakefield described as acting without thinking of the consequences of your Inactions. Dr. Wakefield testified that, based upon Christopher’s severe psychotic symptoms, she believed that it was necessary to determine if the diagnosis should be changed from a bipolar disorder to schizophrenia.
Gary Tiemann, a licensed clinical social worker, first treated Christopher on May 2, 2011, at the referral of Dr. Michael Beason. Dr. Beason reported to Tiemann that Christopher had been committed to LSU-HSC for threatening violence against his mother. Tiemann testified that Dr. Beason believed Tiemann could help Christopher with his history of difficulty with his temper. Over the course of treatment, Tiemann noted inconsistency in Christopher’s thought process, stating that “at times he’s acknowledging how wonderful his mother is and at other time expressing how much he hates her.” Dr. Holder reported to him that she was fearful of her son at times, because he has been violent in the past, and discussed the possibility of schizophrenia. On June 22, 2011, Tiemann noted that Christopher acknowledged frustration with therapy, viewing it as a requirement to stay out of the hospital. He viewed therapy as something others did to him, instead of viewing it as related to his own issues. Christopher tried to minimize the appearance of symptoms out of fear of being hospitalized. In mid-July 2011, Christopher had to be hospitalized for several days to change medications. He had been diagnosed with schizoaffective disorder. On October 4, 2011, Christopher seemed distracted by possible hallucinations and it was clear that he was not interested in therapy. He did not show for an appointment on November 1, 2011, reportedly refusing to come.
|iaDr. Susan Tucker, clinical psychologist for the Bossier Maximum Security Penitentiary (“Bossier Max”), testified that she first saw Christopher on the morning of November 19, 2011, the day after Dr. Holder’s murder. She noted that he showed very little emotion, but did not appear to be hallucinating or psychotic. Christopher reported that he did not take medications because that is not what God wanted and he was hearing “comforting *927 words from God” on the previous morning. On December 3, 2011, Christopher began refusing medication and denied any mental illness. He began to hear voices and self-harm. Christopher began receiving anti-psychotic medications again on December 10. Dr. Tucker testified that Christopher received his medicine on July 6, 2012, but refused medications on August 4. In November 2012, Christopher began displaying an agitated mood and was placed on suicide watch on December 14, 2012. At that time, he requested medication because he was experiencing auditory hallucinations encouraging self-harm and harm of others.
On March 6, 2013, Jessica Farrington, a nurse at Bossier Max, testified that she observed Christopher speak to himself in a “very evil sounding voice” and then respond in a normal voice. As she described the incident:
Farrington: I heard Chris almost like conversing with himself, it was two different voices. The first voice was the real deep sounding voice and he said, “Chris, you’re an F’ing little piece of shit. You killed that” B word, “what you did — you killed that “B” and you’re going to burn in hell for what you did. You stupid little M’Fer.” And it was just in a horrible, horrible sounding voice and then I heard what — it sounded almost like a baby. It sounded like a little child, like (crying sound), like crying like a baby. And that went on for a couple seconds and then back again it was like that demon sound and he was going, | ia“Shut up. Shut up. Shut the “F” up. Shut the “F” up.” and then it would go back to the baby type sound. Defense: How long did that go on to your observation?
Farrington: It seemed like a long time. I mean, it was painful to hear. I don’t know, maybe in reality a minute and a half or maybe two minutes it kind of went back and forth.
He then began striking his head on the floor, and Farrington intervened.
Dr. Anita Flye, a staff psychologist at Bossier Max, also observed and treated Christopher. On July 15, 2013, Christopher reported suicidal ideations and auditory hallucinations. Christopher reported that entities had “haunted him since he was first born” and he could not take it anymore. On two occasions in July 2013, Christopher also appeared to be speaking in a foreign language, a language she had never heard — sounding “religious,” “like a Russian Baltic type” language. She remarked it was “very strange,” and something that did not happen often at Bossier Max. Farrington recalled that, when Christopher was waiting for transport to the East Louisiana Mental Health System Forensic Hospital, he asked whether she knew a doctor who would perform a lobec-tomy so that he could stop hurting himself.
During the trial, Christopher did not contend that he did not kill Dr. Holder, only that he. was not guilty by reason of insanity. After six days of hearing testimony, the jury deliberated and returned with a 10-2 verdict of guilty of the second degree murder of Donna Holder. At his sentencing hearing, Christopher was sentenced to life imprisonment at hard labor | uwithout the benefit of probation, parole, or suspension of sentence. A motion to reconsider sentence was filed, which the trial court denied. This appeal ensued.
Discussion

Insanity Defense

In his first assignment of error, Christopher argues that the jury erred in finding him guilty of the crime charged, contending he' should have been found not guilty by reason of insanity. According to Christopher, he. met his burden of proving that *928 he was suffering from a serious, mental disease at the time of. the crime. Christopher argues that the evidence, specifically the testimony of all medical experts, showed that he was suffering from psychosis at the time of the offense and during interrogation. He alleges that the testimony of Dr. Seiden, the state’s expert witness and the only physician to testify that Christopher could distinguish between right and wrong at the time of the offense, was contradictory in nature. Christopher further argues that his confession, a key piece of évidence against him, was' hot freely and voluntarily givéh due to his mental state, and should not have béen admitted. We disagree. '
The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find thé defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The standard of appellate' review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the [ ^prosecution, any rational trier of fact'could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 ,(2004). This standard, now legislatively embodied in La, C. Cr. P. art. 821, does not provide the appellate court with, a vehicle to substitute its own appreciation, of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.02/22/06), 922 So.2d 517. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.02/25/09), 3 So.3d 685, writ denied 2009-0725 (La.12/11/09), 23 So.3d 913, cert. denied 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
 Direct evidence provides proof of the existence of a fact: for example, a witness’ testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of coilateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact" that the evidence tehds to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Lilly, supra; State v. Robinson, 47,437 (La.App.2d Cir. 11/14/12), 106 So.3d 1028, writ denied 2012-2658 (La.05/l7/13), 117 So.3d 918. "The trier of fact is charged with weighing the credibility of this evidence and on review, the same standard as in Jackson v. Virginia, supra, is applied, giving great deference to the fact finder’s conclusions. State v. Hill, 47,568 (La.App.2d Cir.09/26/12), 106 So.3d 617. When jurors reasonably reject the hypothesis of innocence advanced by a defendant, the hypothesis falls, and the defendant is guilty unless there is another' hypothesis which raises a reasonable doubt. State v. Sosa, 2005-0213 (La.01/19/06), 921 So.2d 94, 99.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover, 47,311 (La.App.2d Cir.10/10/12), 106 So.3d 129, writ *929 denied, 2012-2667 (La.05/24/13), 116 So.3d 659. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 1999-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
Under La. R.S. 15:432, a defendant is presumed to be “sane and responsible for his actions.” This presumption relieves the state from having to prove a defendant’s sanity in all cases. State v. Roy, 395 So.2d 664, 665 (La.1981). A defendant who wishes to rebut the presumption must prove the affirmative defense of insanity by a preponderance of the evidence that, because of a mental disease or mental defect, he was incapable of distinguishing between right and wrong with reference to the conduct in question. La. C. Cr. P. 652; La. R.S. 14:14. All evidence, including both expert and lay testimony, along .with defendant’s conduct and' actions before and after the crime, may be considered in determining whether the defendant has met his burden of proof on an insanity defense. State v. Williams, 2010-1010 (La.App. 5th Cir.09/27/11), 76 So.3d 90, 96.
In reviewing a claim, for insufficiency of evidence in, an action where the affirmative defense of, insanity is. raised* the appellate court, applying the standard set forth in Jackson v. Virginia, supra, must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorably to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Armstrong, 1994-2950 (La.04/08/96), 671 So.2d 307, 309; State v. Peters, 1994-0283 (La.10/17/94), 643 So.2d 1222, 1225.
If there is conflicting evidence on the issue of insanity, the reviewing court should accord great weight to the jury’s resolution of the conflicting evidence provided the jury was properly instructed and no evidence was prejudicially admitted or excluded. State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir.1984), writ denied, 456 So.2d 171 (La.1984). The jury’s decision should not be overturned unless- no rational juror could have found the defendant failed to prove his insanity at the time of the offense. State v. Sharp, 418 So.2d 1344 (La.1982).
 Here, Christopher does not contend that he is innocent of the murder, of his mother, merely that the jury erred in failing to find him-not guilty by reason of insanity. Christopher’s burden was to prove, by a preponderance of the evidence, that.he was incapable of distinguishing right and wrong at the time of the offense, due to a mental disease or defect. In this case, there was extensive testimony concerning Christopher’s history of mental illness and failure to comply with treatment thereof. The defense called numerous lay and expert witnesses regarding Christopher’s mental status.
It is undisputed that Christopher was diagnosed with bipolar disorder with psychotic features, and schizoaffective disorder. . His symptoms included suicidal thoughts, anxiety, depression, auditory hallucinations, delusions, paranoia, homicidal ideations, and violence. Christopher was treated with numerous antipsychotic and anti-anxiety medications. Numerous physicians and healthcare providers testified that Christopher needed to be on medí-, cations for his condition and that his confii *930 tion became severe when not medicated. However, the record also clearly reflects Christopher’s resistance to medications, both due to side effects and the influence of his father. The defense presented testimony regarding at least three prior incidents involving police-assisted and involuntary commitment, all of which occurred when Christopher was not taking his medications as prescribed.
No treating physician was able to testify directly as to Christopher’s mental state on the date of the offense, because he had stopped treatment at least a month prior to the offense. Testimony showed that, in the weeks 119before her murder, Dr. Holder expressed concern for her son, but also admitted that she was afraid of him. She intended to have Christopher committed for treatment and then placed in a group home, which he vehemently opposed.' Only Anne Watson, Christopher’s' aunt, testified as to his behavior on the date of the offense, stating that he was agitated and was not taking his medications. On the day after the offense, psychologists at Bossier Max reported that Christopher showed very little emotion, but did not appear to be experiencing hallucinations. Within weeks, his éondition deteriorated and he began to have auditory hallucinations and suicidal ideations.
Two physicians were appointed to a sanity commission and evaluated the defendant. Dr. Mark Vigen interviewed the defendant on at least five occasions. He testified that, on one occasion, approximately one year after the offense, Christopher reported that he saw through Jesus’ eyes and that Jesus killed Dr. Holder. This ease was the foux-th time in Dr, Vi-gen’s 37-year career that he rendered an opinion that a defendant was not guilty by reason of insanity. In contrast, Dr. Geoi-ge Seiden was unable to get Christopher to discuss the offense, although he did discuss his medical history and diagnoses. Dr. Seiden testified that, although a defendant may suffer from schizoaffec-tive disorder and be psychotic at the time of the offense, he may also know that what he is doing is wrong. Dr. Seiden noted that Christopher called 911, but initially x-eported that an intruder committed the offense, and that Christopher had threatened -violence against Dr. Holder prior to the 12(loffense. Dr. Seiden opined that, despite the psychotic disorder, Christopher was capable of distinguishing right from wrong at the time of the offense.
In the case of such conflicting evidence, the trial court must accord great weight to the jury’s resolution of the evidence. • The jury’s decision should not be overturned unless no rational trier of fact could have found that the defendant failed to meet his burden of proof. Though the evidence leaves no doubt that Christopher suffered from severe mental illness, he failed to meet his burden of proving that he was incapable of distinguishing between right and wrong at the time of the offense. The strongest evidence of his ability to distinguish between right and wrong at the time of the offense-he ■ immediately lied about murdering his mother and fabricated a story of her murder. A defendant’s conduct and action after a crime may properly be considered in determining whether a defendant has met his burden of proof on an insanity defense. Moreover, there is evidence that near the time of her death, Dr. Holder was afraid' of Christopher. The jury also heard Christopher’s confession made the night of the murder. In that confession, Christopher noted being “upset” at the prospect of killing his mother. Notably, he articulated a motive: he was “mad” at his mother, because she was going to medicate him and have him hospitalized. Here, considering that evidence along with Dr. Seiden’s testimony, the jury x-easonably rejected the defendant’s de *931 fense of not guilty by reason of insanity. Thus, we conclude this assignment of error is without merit.
121 Motion to Suppress/Motion in Limine
In his second assignment of error, Christopher argues that the state did not prove that he knowingly and intelligently waived his right to counsel. Christopher argues that, due to a serious mental defect, he was unable to waive his rights 'before interrogation. He asserts that the investigating officers were aware of previous incidents caused by his mental illness. Christopher further argues that there was no evidence that he was advised of his right to counsel or that he waived that right. He asserts that he was never asked whether he wanted an attorney during questioning, whether he understood his rights, and whether he wished to waive his rights. We disagree. ■ ■ •
At a hearing on a motion to suppress a confession the state bears the burden' of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La.App.2d Cir.04/07/00), 756 So.2d 1272, writ denied, 2000-1427 (La.05/11/01), 791 So.2d 1288. Before a confession can be introduced into evidence, the state must affirmatively prove that it was free and volun tary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Bowers, 39,970 (La.App. 2d Cir.08/19/05), 909 So.2d 1038; State v. Roddy, supra. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Bowers, supra; State v. Franklin, 35,-268 (La.App.2d Cir.12/19/01), 803 So.2d 1057, writ denied, 2002-0352 (La.02/07/03), 836 So.2d 85.
The admissibility of a confession is a question for the trial court. When determining admissibility, the trial court’s conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. State v. Thibodeaux, 1998-1673 (La.09/08/99), 750 So.2d 916, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000); State v. Dailey, 607 So.2d 904 (La.App. 2d Cir.1992). Great weight is placed upon the trial court’s factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Thibodeaux, supra. Testimony of the interviewing po lice officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, supra. In proving an intelligent waiver of the rights to silence, protection against self-incrimination and counsel, the state need not show that a defendant was aware of the full evidentiary significance of his statements. See State v. Mitchell, 421 So.2d 851 (La.1982); State v. Reynolds, 45,674 (La.App.2d Cir.11/03/10), 55 So.3d 136. Moreover, as the United States Supreme Court noted, a suspect’s awareness of all the crimes about which he could be questioned is not relevant to waive the Fifth Amendment privilege against self-incrimination. See Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).
Great weight is placed upon the trial court’s ruling on a motion to 12Hsuppress in regard to'the finding of facts because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Howard, 49,965 (La.App.2d Cir.06/24/15), 169 So.3d 777. Accordingly, this court reviews the trial court’s ruling on a -motion to suppress under the manifest error standard in re *932 gard to factual determinations, while applying a de novo review to its findings of law. State v. Hemphill, 41,526 (La.App.2d Cir.11/17/06), 942 So.2d 1263, 1271, writ denied, 2006-2976 (La.3/9/07), 949 So.2d 441.
The trial court conducted a hearing on -Christopher’s motion to suppress and motion in limine. Three Bossier City Police Department reports and a coroner’s report were stipulated to and entered into evidence. Corporal Sanford testified that on November 18, 2011, a 911 call came in at 7:15 p.m. Officer Engi testified that he informed officers on the scene that he was aware that Christopher suffered from possible anger issues and was on medication. Officer Charlie Spraggins testified that he informed Christopher of his Miranda rights prior to placing him in the police car at the scene. Officer Brandon Huckaby testified that, upon arrival at the scene, he was instructed by Sergeant Gilbert to retrieve any police reports involving the address. He made , copies of three reports and delivered them to Detective Kevin Little, because Cpl. Sanford had already begun questioning Christopher. Officer Huckaby could not recall the exact time that the reports were, delivered, but stated that he had the reports within 45 minutes of his arrival at the scene. Detective Little testified that he did not recall providing those reports to Cpl. Sanford on the night of the crime.
1 ^Officer Lindsey Harvey testified that, while waiting for a search warrant of the residence, she collected Christopher’s clothing, and photographed and videotaped his body. She had no communications with him.
Corporal Sanford testified that he read Christopher his Miranda rights prior to questioning at the police station. Christopher signed a “rights card,” which was admitted as State’s Exhibit No. 1, to acknowledge the reading. Corporal Sanford denied any knowledge,of prior incidents involving Christopher and the police. He testified that he did not begin recording the interview until Christopher began “telling the truth,” which was his normal practice. Only the fourth of four statements was recorded, at 9:30 p.m. Corporal Sanford stated that Christopher gave no indication of diminished mental ability during the interview. At no time did Christopher request the presence of an attorney.
Dr. Frederick Mears, a clinical neurop-sychologist, testified that he evaluated Christopher on behalf of the defense. ■ Dr. Mears, after testing and evaluation, opined that Christopher “was not sane at the time of the offense,” and would not have the requisite mental status to understand his rights and knowingly waive them. Dr. Vigen, a psychiatrist and a member of the sanity commission who evaluated Christopher, testified that Christopher became delusional, agitated, violent, and dangerous to himself when not medicated. Dr. Vigen testified that he did not conduct an investigation with the goal of determining Christopher’s understanding and waiver of his rights., However, |Mhe opined that because Christopher did not know the wrongfulness of his behavior, it would be highly unlikely that he could knowingly waive his rights. Dr. Vigen acknowledged that he had not listened to the recorded confession, that Christopher had tried to avoid responsibility by accusing an intruder, and that he was not aware of any duress or intimidation prior to the confession.
Dr. Seiden, the other member of the sanity commission, testified that the majority of psychotic patients retain decisional competence. He stated that a specific methodology of evaluation was needed to determine if Christopher knowingly waived his rights, rather than the method *933 used to determine competence to stand trial. Dr. Seiden did not believe that the proper methodology was used by any evaluating physician, in this case, and that any opinion that Christopher did not knowingly waive his rights was merely an inference from the fact that he was psychotic. He testified that, based on his review, it appeared that Christopher knew that he was waiving his rights.
The record clearly reflects that Christopher was properly advised of his rights on more than one occasion, by at least two different officers, prior to questioning. The testimony of the interviewing police officer alone may be' sufficient to prove that the statement was given freely and voluntarily. Despite assertions by the defense that Christopher was not advised of his right to counsel, the signed card and recorded statement show that Cpl. Sanford advised Christopher of that right, which Christopher waived. There is no evidence that Christopher requested an attorney at any time. Further, 1 afiChristopher failed to present any evidence that his statement was made under the influence of fear, duress, or intimidation.
Christopher argues that, despite knowing of his history of mental illness, officers conducted an aggressive, threatening, and intimidating interrogation. He asserts that, because of a serious mental illness, he was unable to knowingly waive his rights prior to making a recorded confession. While the record reflects that some officers on the scene were aware of Christopher’s condition, he failed to provide any evidence that Cpl. Sanford was aware of his mental illness prior to questioning. In fact, Cpl. Sanford specifically' denied any prior knowledge and testified that Christopher did not display any behaviors that would lead to a belief that he was suffering fiwn. a severe mental illness that , could affect his ability to knowingly waive his rights. Dr. Seiden testified that a- psychotic patient often retains the competence to make decisions; Notably, although Christopher may suffer from mental illness, he is not an unintelligent person.
The state was not required to show that Christopher was .aware of the full eviden-tiary significance of his statements. Here, the trial court did not err in. denying the motion to. suppress and motion in limine and in finding that Christopher’s statement was admissible. This assignment is without merit.

Jury Instruction

Christopher also- argues that the jury instruction regarding the. “consequences” of a verdict of not guilty by reason of insanity caused two jurors to change their vote to “guilty.” The original vote of the jurors was height to convict and four for not guilty by reason of insanity. He asserts that his counsel was informed, by jurors, that the instruction caused them to fear that Christopher would be released from custody if he was found not guilty by reason of insanity. As a result, two jurors changed their votes to guilty, leading to a jury conviction by a 10-2 vote. He argues that fear of release may not affect a verdict and that he is entitled to a new trial because the instruction denied his right to a fair trial.'
Louisiana C. Cr. P. art. 801(A) provides that “[t]he court shall charge the jury after the' presentation of all evidence and arguments.”. A defendant “may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within • such time as the court may reasonably cure the alleged error.” La. C. Cr. P. art. 801(C). As such, the failure to make a contemporaneous objection to a jury instruction or charge waives appellate review of the alleged error, unless the error raises overriding due *934 process considerations. State v. Smith, 46,343 (La.App.2d Cir.06/22/11), 71 So.3d 485; writ denied, 2011-1646 (La.01/13/12), 77 So.3d 950.
On August 19, 2014, a discussion was held by the court and all counsel regarding proposed jury instructions. The defense made no objection to the instructions, even when explicitly asked for approval. The jury instructions were filed into the record, with no objections. The trial court then read the instructions to the jury. The complained of instruction was read without objection. Under La. C. Cr. P. art. 801(C), the defendant is | ^barred from challenging the jury charge he now argues was objectionable. This assignment is without merit.

Refusal to Grant Judge Trial

Christopher also argues that the trial court improperly denied his request for a judge trial, stating the request was untimely. He argues that the trial court’s ruling was based upon an inapplicable amendment to La. C. Cr. P. art. 780(B). He asserts that, at the time of the offense, a defendant could waive his right to a jury trial at any time prior to trial, with the court’s permission.
Prior to its amendment and at the time of the subject offense, La. C. Cr. P. art. 780(B) pi’ovided that a defendant:
shall exercise his right to waive trial by jury in accordance with the time limits set forth in Article 521. However, with permission of the court, he may exercise his right to waive trial by jury at any time prior to the commencement of trial.
Subsection C provided for the withdrawal of a waiver of trial by jury. At all times relevant, La. C. Cr. P. art. 521 provided that “[pjretrial motions shall be made or filed within fifteen days after arraignment, unless a different time is provided by law or fixed by the court at arraignment upon a showing of good cause why fifteen days is inadequate.”
Louisiana C. Cr. P. art. 780(B) was amended effective June 17, 2013, and at the time of this trial provided that “[t]he defendant shall exercise his right to waive trial by jury in accordance with Article I, Section 17 of the Constitution of Louisiana. The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial.” Only with the consent of the district attorney can a defendant waive | gcihis right to trial by jury within 45 days prior to the commencement of trial. La. C. Cr. P. art. 780(C). The amendment brought La. C. Cr. P. art. 780 into alignment with La. Const. Art. I, § 17, which at all times relevant, provided that “[ejxcept in capital cases, a defendant may knowingly and intelligently waive his right to a trial by jury but no later than forty-five days prior to the trial date and the waiver shall be irrevocable.”
Any error with respect to defendant’s jury trial waiver is merely a waivable trial error and not a non-waivable structural defect. State v. T.T., 2012-0146 (La.App. 1st Cir.09/21/12), 111 So.3d 71. In this case, Christopher elected to be tried by a jury and trial was set for August 11, 2014. On July 24, 2014, he filed a motion to waive that right and be tried by a judge. The motion was taken up on August 4, 2014, and the trial court denied the motion as untimely, finding that such a motion must be filed 45 days prior to trial pursuant to the statute. As in State v. T.T., supra, the defense noted no objection to the trial court’s ruling. As such, Christopher waived any objection to the alleged error. This assignment is without merit.

Admission of “Irrelevant” Evidence

On review, Christopher argues that the trial court admitted irrelevant evidence regarding the divorce proceedings *935 between Donna and Gary Holder, as well as the proceedings in the Succession of Donna Holder. Christopher first argues that Herman Sockrider, counsel for Dr. Holder in the divorce proceedings, was permitted to testify with the sole purpose of attacking Gary Holder. He further argues that Charles Tabor, attorney for lanthe Succession of Donna Holder, was permitted to testify regarding claims made on the estate, inferring that Gary Holder and Christopher conspired to commit the crime.
An opportunity to be heard, an essential component of procedural fairness, would be an empty one if the state were permitted to exclude competent rehable evidence. State v. Wetland, 505 So.2d 702 (La.1987); State v. Myers, 583 So.2d 67 (La.App. 2d Cir.1991), writ denied, 585 So.2d 576 (1991). Evidence is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. The determination of whether evidence is relevant is made by the standards of logic and experience. State v. Myers, supra. Even relevant evidence may be excluded if it would be too time consuming or would unnecessarily confuse or excite the emotions of the jury. Id. Evidence which is not relevant is not admissible. La. C.E. art. 402. A trial judge’s determination regarding the relevancy of offered testimony is entitled to great weight and should not be overturned absent a clear abuse of discretion. State v. Myers, supra; State v. Burrell, 561 So.2d 692 (La.1990).
The credibility of a witness may be attacked by any party. La. C.E. art. 607(A). Louisiana has long sanctioned the impeachment of a witness in a criminal trial by his or her prior inconsistent statements. La. C.E. art. 607(D)(2); State v. Owunta, 1999-1569 (La.05/26/00), 761 So.2d 528, 529. The admissibility of extrinsic evidence to impeach credibility of a witness is subject to the relevancy balancing test, which requires the court to determine |ai whether “the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.” La C.E. art. 607(D)(2); State v. Juniors, 2003-2425 (La.06/29/05), 915 So.2d 291, 330.
Christopher complains that the trial court admitted irrelevant evidence regarding the divorce proceedings between Donna and Gary Holder, as well as the Succession of Donna Holder. Sockrider’s testimony was offered, following the close of the defense’s case, to rebut Gary Holder’s testimony regarding the cause of his divorce from Dr. Holder. Sockrider testified that the' divorce was contentious “from the very beginning till the end,” explaining that the main source of contention was Christopher’s diagnosis and treatment. He ■ stated that Gary Holder did not believe that Christopher suffered from any mental illness and would instruct his son not to take medications. We see no difference in this testimony from other witnesses, such as Ms. Watson and Dr. Branham, who made the same observations during their testimony.
The state also called Charles Tabor, attorney for the Succession of Dr. Holder, to further challenge the credibility of Gary Holder. After an objection by the defense, the trial court held that Tabor could testify as to Gary Holder’s credibility, but that he could not testify as to the succession proceedings. Tabor only testified to the fact that Robert Green, Dr. Holder’s brother, Christopher Holder, and Gary Holder all made claims in Dr. Holder’s succession.
*936 ls¡>Here, Sockrider and Tabor were called by the state to challenge the credibility of a key defense witness, Gary Holder, which was clearly within the state’s right. Sock-rider’s-testimony was very brief and focused solely on challenging Gary Holder’s credibility -by showing his strong belief that his son was not mentally ill and did not require, medications. The testimony, of Tabor- amounted to a single sentence, which listed the names of three people who made claims on the succession of Dr. Holder. Considering the evidence offered by the state tending to show Christopher’s guilt, we see no abuse in discretion in admitting the brief testimony of Herman Sockrider and Charles • Tabor. This assignment is without merit.
Conclusion
For the foregoing reasons, the conviction and sentence of Christopher Wayne Holder for second degree .murder are affirmed.
AFFIRMED.

. Three coroner's emergency certificates were introduced into evidence as stipulated to by both parties.