697 So.2d 948 (1997)
COMMUNITY BLOOD CENTERS OF SOUTH FLORIDA, INC., f/k/a Broward Community Blood Center, Inc., Petitioner,
v.
Francine DAMIANO, individually and derivatively, Alfred Damiano, her husband, individually and derivatively, Anthony Damiano, Michelle Damiano and Christine Damiano, minors, individually, by and through their parents and next friend, Respondents.
No. 96-3642.
District Court of Appeal of Florida, Fourth District.
July 30, 1997.
Rehearing Denied September 16, 1997.
*949 PER CURIAM
Petitioner, Community Blood Centers of South Florida, Inc. (the blood bank), challenges an order denying its motion to dismiss. We find that the blood bank was not a health care provider for the purpose of requiring plaintiffs to comply with the medical malpractice presuit requirements. Thus, we do not find that the trial court departed from the essential requirements of law in denying the blood bank's motion to dismiss. Accordingly, we deny the petition for writ of certiorari.
The background facts are as follows. On June 15, 1986, Francine Damiano received a blood transfusion after giving birth to twins. In 1990, Francine was diagnosed with AIDS. Plaintiffs' complaint, filed on June 26, 1992, named both Francine's obstetrician, Grover McDaniel, M.D. (Dr. McDaniel), and the blood bank as defendants. The complaint alleged that the blood, which was supplied by the blood bank, was contaminated with the HIV/AIDS virus, causing Francine to become infected.
Plaintiffs alleged that Dr. McDaniel was negligent in ordering repeated blood transfusions even though Francine was not in a lifethreatening situation. Plaintiffs also alleged that the blood bank had notice within months after the transfusion that recipients like Francine may have been exposed to the AIDS virus, yet this information was never communicated to plaintiffs. Unaware she had been exposed to AIDS, Francine infected and transmitted the AIDS virus to her husband, Alfred Damiano.[1]
Prior to instituting suit, plaintiffs served a notice of intent to sue, including a corroborating expert affidavit, on Dr. McDaniel. No similar notice of intent was served on the blood bank.[2]
It was not until June 18, 1996, over four years after plaintiffs had filed their lawsuit, that the blood bank filed a motion to dismiss the complaint based on plaintiffs' noncompliance with section 766.106, the medical malpractice presuit requirements. The trial court denied the motion to dismiss.
To support the denial of the motion to dismiss, plaintiffs rely primarily on Silva v. Southwest Florida Blood Bank, Inc., 601 So.2d 1184 (Fla.1992), which held that an action against a blood bank as a supplier of blood was not a medical malpractice action *950 for statute of limitation purposes. In Silva, our supreme court examined whether, under subsection 95.11(4)(b), Florida Statutes (1991): (1) the action arose out of "medical... diagnosis, treatment, or care," and (2) whether such diagnosis, treatment, or care was rendered by a "provider of health care." Subsection 95.11(4)(b), provides in pertinent part:
An "action for medical malpractice" is defined as a claim in tort or in contract for damages because of the death, injury, or monetary loss to any person arising out of any medical, dental, or surgical diagnosis, treatment, or care by any provider of health care. The limitation of actions within this subsection shall be limited to the health care provider and persons in privity with the provider of health care.
(Emphasis supplied).
With respect to the first prong, our supreme court found no ambiguity in the terms "diagnosis, treatment, or care," defining these terms
to mean ascertaining a patient's medical condition through examination and testing, prescribing and administering a course of action to effect a cure, and meeting the patient's daily needs during the illness. This parallels the dictionary definitions of those terms. According to Webster's Third International Dictionary (1981), "diagnosis" means "the art or act of identifying a disease from its signs and symptoms." Id. at 622. "Treatment" means "the action or manner of treating a patient medically or surgically." Id. at 2435. "Care" means "provide for or attend to needs or perform necessary personal services (as for a patient or child)." Id. at 338. Likewise, in medical terms, "diagnosis" means "[t]he determination of the nature of a disease." Stedman's Medical Dictionary 428 (25th ed.1990). "Treatment" means "[m]edical or surgical management of a patient." Id. at 1626. And "care" means "the application of knowledge to the benefit of ... [an] individual." Id. at 249.
Silva, 601 So.2d at 1187.
Our supreme court determined, based on the allegations in the complaint, that the blood bank sold the blood product to the treating hospital, which in turn sold it to the plaintiffs:
The blood bank and its employees never saw the recipients of the blood product or had any contact whatsoever. Neither the blood bank nor any of its employees had any knowledge or information about the recipients' medical conditions. Southwest played no role in determining the nature of the plaintiff patients' illnesses, did not treat those patients, and did not attend to the personal needs of those patients.
Id.
As to those cases where a blood bank was sued for having provided diagnosis, treatment, or care, our supreme court then addressed whether the blood bank met the second requirement of subsection 95.11(4)(b): that the diagnosis, treatment, or care be rendered by a "provider of health care." It rejected utilizing the definition provided in subsection 768.50(2)(b),[3] which addressed collateral sources of indemnity and which was repealed in 1986:
We can find no indication that the legislature intended for blood banks to be considered "providers of health care" for purposes of the medical malpractice statute of *951 limitations. Nor do we find it permissible generally to construe that term broadly. In the absence of clear legislative intent to the contrary, we are not at liberty to construe that term [providers of health care] so as to deprive plaintiffs of their causes of action.

Id. at 1189 (emphasis supplied) (citation omitted).
The blood bank argues that although the medical malpractice statute of limitations does not apply to actions against blood banks, plaintiffs nevertheless were bound to comply with the presuit requirements of chapter 766, including subsection 766.106(2). This subsection requires notice to the defendant in a medical malpractice action after completion of presuit screening, "prior to filing a claim for medical malpractice."
The blood bank insists that based on the supreme court's reasoning in Weinstock v. Groth, 629 So.2d 835 (Fla.1993), the blood bank should be considered a health care provider entitled to presuit notice and screening. In Weinstock, our supreme court held that licensed clinical psychologists are not health care providers entitled to presuit notice and screening under the Comprehensive Medical Malpractice Reform Act of 1985 because they are not so defined under any of the chapter 766 definitions.
To decide this question, our supreme court considered the definition of "health care providers." Although subsection 766.106(1)(a) defines a claim for medical malpractice, section 766.106 does not define a "health care provider." In fact, in NME Properties, Inc. v. McCullough, 590 So.2d 439, 440 n. 1 (Fla. 2d DCA 1991), the court lamented the difficulty of interpreting chapter 766 because of the lack of comprehensive definitions.
In Weinstock, our supreme court determined that psychologists were not included in any of the chapter 766 definitions of "health care provider." See § 766.102; § 768.50(2), Fla.Stat. (1985);[4] § 766.101(1)(b);[5] § 766.105(1)(b).[6] Our supreme court therefore held that the exclusion of psychologists from the various definitions of this term indicated a legislative intent that psychologists not be classified as health care providers. 629 So.2d at 837. Here, defendant points out that blood banks are defined as a health care provider under subsection 768.502(b). While that is true, blood banks are listed nowhere else within the statutory definition of chapter 766; e.g., subsections 766.101(1)(b) and 766.105(1)(b).
To reach the result in Weinstock, our supreme court reasoned that a narrow construction of the presuit notice requirements is in accord with the rule that restrictions on access to the courts must be strictly construed in a manner that favors access. Id. at 838; Patino v. Einhorn, 670 So.2d 1179 (Fla. 3d DCA 1996). Thus, the court in Weinstock *952 intended to limit the classifications of defendants entitled to presuit notice to minimize its effect on the constitutionally-protected right to access to the courts. See Art. I, § 21, Fla. Const.
Construing the Medical Malpractice Reform Act as requiring that presuit notice be given to a blood bank, as a condition precedent to maintaining an action arising from supplying contaminated blood, would be to engraft a requirement of presuit notice through section 766.106, with its extensive provisions for informal discovery and a 90day investigatory procedure for both plaintiffs and blood banks, even though the action does not involve treatment and care by the blood bank.
The presuit notice can be sent only after plaintiff complies with the "reasonable investigation requirements of ss. 766.201-766.212." § 766.206(2); see also § 766.106(2). Failure to comply with the reasonable investigation requirements is grounds for dismissal of the complaint. § 766.206(2). However, many of these requirements would be inapplicable to a blood bank being sued as a supplier of blood. For example, subsection 766.203(2)(a) provides that a plaintiff "shall conduct an investigation to ascertain that there are reasonable grounds to believe that: (a) Any named defendant in the litigation was negligent in the care and treatment of the claimant...." (Emphasis supplied). Because ablood bank that only supplies blood is involved in neither care nor treatment, see Silva, a plaintiff would be unable to comply with this provision with regard to such blood bank defendants. This is further evidence that the presuit requirements were never intended to apply to a blood bank being sued as a supplier of blood.
Without a clear expression of legislative intent to the contrary, we interpret the applicable statutes as excluding blood banks from the malpractice presuit requirements in actions against them as suppliers of contaminated blood, where blood banks have not rendered any treatment or care. This is in accord with the principle that statutes restricting access to the courts must be strictly construed in a manner that favors access. Weinstock, 629 So.2d at 838; Silva, 601 So.2d at 1189.
STONE, C.J., and POLEN, J., concur.
PARIENTE, J., concurs specially, with opinion.
PARIENTE, Judge, concurring specially.
I would affirm the denial of the petition, even if the blood bank could be deemed a health care provider, because the blood bank delayed filing its motion to dismiss for four years  until it was too late for plaintiffs to comply with the presuit notice requirements. Thus, plaintiffs now have no opportunity to cure the defect. Because plaintiffs complied with the presuit requirements as to Dr. McDaniel, there is no indication that plaintiffs would have been unable to comply as to the blood bank if they had been aware, or had been made aware in a timely fashion, that the presuit requirements were applicable to the blood bank.
In Ingersoll v. Hoffman, 589 So.2d 223 (Fla.1991), the defendant waited until trial to move to dismiss the plaintiff's failure to provide him with a presuit notice of intent to sue under section 768.57, which was renumbered in 1988 as section 766.106. See § 766.106, Fla.Stat. (Supp.1988). The trial court dismissed the suit for failure to provide the notice of intent. In rejecting the view that the notice requirements were jurisdictional, our supreme court held that the presuit requirements were conditions precedent which did not implicate subject matter jurisdiction. Ingersoll, 589 So.2d at 224.
Justice Grimes, writing for our supreme court, noted that if the defendant had timely raised the failure to comply, the plaintiffs could have attempted to comply within the statute of limitations. Id. at 225. To allow an amendment to the defendant's pleadings after the statute of limitations had run would unfairly prejudice the plaintiffs. Id. Our supreme court thus reversed the order granting the motion to dismiss.
In Kukral v. Mekras, 679 So.2d 278 (Fla. 1996), our supreme court reversed the dismissal of a complaint for failure to comply with presuit investigation requirements. In determining that the failure to comply with *953 the presuit investigation requirements is not a jurisdictional defect, our supreme court stated:
We agree with the proposition that the medical malpractice statutory scheme must be interpreted liberally so as not to unduly restrict a Florida citizen's constitutionally guaranteed access to the courts, while at the same time carrying out the legislative policy of screening out frivolous lawsuits and defenses.
Id. at 284.
This court recently recognized that the "guiding principle" in construing chapter 766 presuit requirements is to do so "in such a way that failure to comply with them may not result in a final dismissal of the action unless it is clear that the claimant could not possibly cure the defect and still maintain the action in compliance with the statutes." Citron v. Shell, 689 So.2d 1288, 1290 (Fla. 4th DCA 1997).
Pursuant to Ingersoll and Kukral, I would find that the blood bank waived its right to raise the issue of failure to comply with the presuit requirements. The blood bank did not raise the issue until four years after the lawsuit had been filed and after the opportunity to cure the defect had passed as a result of the expiration of the statute of limitations. To allow a defendant to wait years into a lawsuit before moving to dismiss for noncompliance would neither serve the purpose of the Medical Malpractice Reform Act nor further the interests of justice.
In any event, I would not grant certiorari because defendant has not demonstrated in this case either irreparable injury or a departure from the essential requirements of law. Orders denying motions to dismiss are not generally reviewed by appellate courts by means of petitions for certiorari. We have recognized, however, that certiorari review may be used to challenge an order that denies a motion to dismiss for failure to comply with the statutory presuit notice requirements "provided that there is a demonstrable irreparable injury and a departure from the essential requirements of law." Oenbrink v. Schiegner, 645 So.2d 167, 168 (Fla. 4th DCA 1994), review denied sub nom. Palm Beach Gardens Med. Ctr. v. Schiegner, 654 So.2d 131 (Fla.1995).[7]
In Sova Drugs, Inc. v. Barnes, 661 So.2d 393, 394 (Fla. 5th DCA 1995), the fifth district explained the reason for exercising certiorari jurisdiction in this limited instance:
The justification for this exception is to promote the purpose of the statutory procedures under the Act, which are designed to encourage settlement of cases. If the case is fully litigated, without resort to the presuit procedures, that purpose would be frustrated, and appellate courts could not properly remedy the cause on appeal.
See also Pearlstein v. Malunney, 500 So.2d 585, 587 (Fla. 2d DCA 1986) (after fundamentally fair trial it would make no sense to remand for compliance with cost-saving procedures; thus, noncompliance cannot be remedied on direct appeal), review denied, 511 So.2d 299 (Fla.1987).
"[T]he purpose of the Chapter 766 presuit requirements is to alleviate the high cost of medical negligence claims through early determination and prompt resolution of claims, not to deny access to the courts...." Weinstock, 629 So.2d at 838 (citing Ragoonanan v. Associates in Obstetrics & Gynecology, 619 So.2d 482 (Fla. 2d DCA 1993)) (emphasis supplied); see also Kukral, 679 So.2d at 284; § 766.201. The presuit procedures were intended to be a cost-saving method to educate both parties as to the nature of the medical malpractice claim. The procedures were designed to ferret out frivolous claims by holding both plaintiffs' and defendants' feet to the fire of pre-trial discovery and reasonable investigation.
As noted by Justice Grimes in Ingersoll, the presuit notice and screening requirements represent more than mere technicalities. Ingersoll, 589 So.2d at 224. "The legislature has established a comprehensive procedure designed to facilitate the amicable *954 resolution of medical malpractice claims." Id.
If a primary purpose of the presuit requirements is to alleviate the high cost of medical negligence claims through early determination and prompt resolution of claims, and not to deny access to the courts, see Weinstock, 629 So.2d at 838, then it makes no sense to exercise our certiorari jurisdiction to review orders denying motions to dismiss filed long after the lawsuit has been filed. The justification for the exception to our normal procedure of not reviewing orders denying motions to dismiss by certiorari, as set forth in Citron, no longer exists when there has been a lengthy delay by a defendant in bringing the issue of noncompliance to the trial court's attention. To dismiss a complaint under these circumstances would be "to deny parties access to the court on the basis of technicalities." Ragoonanan, 619 So.2d at 484.
If the blood bank truly desires to promptly resolve the claim at this advanced stage of the proceedings, it could request arbitration or court-ordered mediation. To exercise our certiorari jurisdiction in this case and allow dismissal of the complaint would not foster the purposes of the presuit requirements and would make a mockery of the well-motivated purposes of the presuit requirements.
NOTES
[1] Subsequent to the filing of the lawsuit, Francine Damiano died and the personal representative of her estate was substituted as a plaintiff.
[2] After suit was filed, summary judgment was entered for Dr. McDaniel on the basis that the statute of repose had run, even though plaintiffs had no notice of injury prior to the expiration of the repose period. Our court affirmed this summary judgment, Damiano v. McDaniel, 670 So.2d 1198 (Fla. 4th DCA 1996), approved, 689 So.2d 1059 (Fla.1997), but certified the question of whether the statute of repose is unconstitutionally applied when it bars an action where the injury does not manifest itself within the statutory four-year term. Our supreme court concluded, consistent with existing precedent, that the action against Dr. McDaniel was barred. Id. at 1061.
[3] The definition in the now-repealed section dealt with collateral sources of indemnity and did not pertain to medical malpractice claims. Subsection 768.50(2)(b) provided:

"Health care provider" means hospitals licensed under chapter 395; physicians licensed under chapter 458; osteopaths licensed under chapter 459; podiatrists licensed under chapter 461; dentists licensed under chapter 466; chiropractors licensed under chapter 460; naturopaths licensed under chapter 462; nurses licensed under chapter 464; clinical laboratories registered under chapter 483; physicians' assistants certified under chapter 458; physical therapists and physical therapist assistants licensed under chapter 486; health maintenance organizations certified under part II of chapter 641; ambulatory surgical centers as defined in paragraph (c); blood banks, plasma centers, industrial clinics, and renal dialysis facilities; or professional associations, partnerships, corporations, joint ventures, or other associations for professional activity by health care providers.
§ 768.50(2)(b), Fla.Stat. (1985) (emphasis supplied).
[4] Subsection 768.50(2)(b), Florida Statutes (1985), which was repealed in 1986, is incorporated only through section 766.102 which provides:

(1) In any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider as defined in s. 768.50(2)(b), the claimant shall have the burden of providing by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider.
§ 766.102(1), Fla.Stat. (1995) (emphasis supplied) (footnote omitted).
[5] Subsection 766.101(1)(b) defines health care providers as:

physicians licensed under chapter 458, osteopaths licensed under chapter 459, podiatrists licensed under chapter 461, dentists licensed under chapter 466, chiropractors licensed under chapter 460, pharmacists licensed under chapter 465, or hospitals or ambulatory surgical centers licensed under chapter 395.
§ 766.101(1)(b), Fla.Stat. (1995).
[6] Subsection 766.105(1)(b) defines a health care provider as any:

1. Hospital licensed under chapter 395.
2. Physician licensed, or physician assistant certified, under chapter 458.
3. Osteopath licensed under chapter 459.
4. Podiatrist licensed under chapter 461.
5. Health maintenance organization certificated under part I of chapter 641.
6. Ambulatory surgical center licensed under chapter 395.
7. "Other medical facility" as defined in paragraph (c).
8. Professional association, partnership, corporation, joint venture, or other association by the individuals set forth in subparagraphs 2., 3., and 4. for professional activity.
§ 766.105(1)(b), Fla.Stat. (1995).
[7] See also Tunner v. Foss, 655 So.2d 1151 (Fla. 5th DCA), review denied, 663 So.2d 630 (Fla. 1995); Shands Teaching Hosp. and Clinics, Inc. v. Barber, 638 So.2d 570 (Fla. 1st DCA 1994); Miami Physical Therapy Assocs., Inc. v. Savage, 632 So.2d 114 (Fla. 3d DCA 1994); NME Hosps., Inc. v. Azzariti, 573 So.2d 173 (Fla. 2d DCA 1991).