CARAWAY, J.
h Joseph Butler was convicted in a bench trial of manslaughter and subsequently adjudicated a second felony offender. He was sentenced to 28 years at hard labor. Butler.appeals his conviction and sentence. We affirm the conviction and amend the sentence to reinstate the imposition of sentence without benefit of probation or suspension of sentence.

Facts

In the late afternoon hours of December 21, 2012, Shreveport police were dispatched to the Shreveport home of Carolyn Butler. When police entered the home, they found the lifeless body of Butler’s boyfriend, Larry Patterson,' in the bedroom of Butler’s 36-year-old son, Joseph. Patterson had been shot twice,- including a fatal shot to the head. Carolyn Butler had witnessed Patterson and'Joseph exchange angry words and saw them both’ head to Joséph’s bedroom. She heard gunshots and left the home. As she was trying to get into her car, she saw Joseph trying to open a package of noodle sauce.
Carolyn drove down the street to a school where she called her other son, who *182 was a Shreveport police ofScer. Within a short time after the discovery of Patterson’s body, Joseph Butler turned himself in to police. Butler had what lab tests later confirmed to be Patterson’s blood on his clothing. Police located a handgun on the roof of the garage at Carolyn Butler’s home and six cartridge casings in Joseph Butler’s room.
On February 20, 2013, Butler was charged by bill of indictment with the second degree murder of Patterson. On August 28, 2013, Butler filed a ^motion requesting the appointment of a sanity commission to determine both his competency to stand trial and his sanity at the time of the alleged offense. The trial court granted the motion and appointed Drs. Marc Colon and George Seiden to evaluate Butler. On November 5, 2013, a sanity hearing was held. The physicians’ reports were provided to the trial court without argument. Based on the reports, the trial court found Butler competent to stand trial.
On February 13, 2014, Butler amended his initial plea of not guilty to not guilty by reason of insanity. He waived his right to a jury trial and a bench trial commenced on July 1, 2014. On July 8, 2014, following the presentation of evidence and closing arguments, the trial court found Butler guilty of manslaughter and ordered the preparation of a presentence investigation report (PSI).
On July 23, 2014, Butler requested a judgment of acquittal by reason of insanity alleging that the evidence adduced at trial proved that he was unable to determine right from wrong at the time of the shooting as evidenced by his irrational behavior at the time of the offense.[1] Although Butler admitted to throwing the gun on the roof of his mother’s garage after the shooting, he noted that he did not wipe it clean or remove any of the shell casings from the scene of the crime. Butler walked around with blood on his clothing after killing Patterson and was due for an injection of | .¡Risperdal five days after the shooting. After argument, the trial court denied the motion on August 12, 2014.
On September 24, 2014, the state filed an habitual offender bill of information charging Butler as a second felony offender. In particular, the bill alleged that the defendant had been convicted of theft of goods, second or subsequent offense, on May 31, 2011. On May 27, 2015, the trial court adjudicated Butler a second felony offender and ultimately sentenced him to 28 years at hard labor without benefit of probation or suspension of sentence. The trial court further ordered that Butler be offered all mental health treatment available while incarcerated.
On June 23, 2015, Butler filed a motion to reconsider his sentence asserting that it should not have been imposed without the benefit of probation or suspension of sentence due to the age of the victim. On July 13, 2015, the trial court granted Butler’s motion and amended his sentence to remove the probation and suspension of sentence restrictions. Butler then appealed his conviction and sentence.

Discussion

On appeal, Butler raises four assignments of error. In his first two arguments he urges that the trial, court erred in finding him guilty of manslaughter because he was insane at the time of the offense. Butler concedes that he shot Patterson, but claims that the evidence adduced at trial proves that he did not know right *183 from wrong at the time. In support of his position, Butler points out that the argument that led to Patterson’s death was trivial. He argues that both Drs. Seiden and Colon agreed that Butler Usuffers from schizophrenia and that Dr. Seiden noted Butler’s history of psychotic disorder. Further, Butler argues that the fact he gave Dr. Seiden a different version of facts from what the evidence showed at trial, indicated he had very little memory of the events leading to Patterson’s death. Finally, Butler points to the testimony of his family members as anecdotal evidence of his mental illness. Butler also urges error in his second felony offender adjudication and the excessiveness of his sentence.

Sufficiency of the Evidence/Sanity

Louisiana law presumes a defendant is sane and responsible for his or her actions. La. R.S. 15:432. A defendant who wishes to rebut the presumption must prove the affirmative defense of insanity by a preponderance of the evidence that, because of a mental disease or mental defect, he was incapable of distinguishing between right and wrong with reference to the conduct in question. La.C.Cr.P. art. 652; La. R.S. 14:14; State v. Holder, 50,-171 (La.App.2d Cir.12/9/15), 181 So.3d 918. All evidence, including both expert and lay testimony, along with defendant’s conduct and actions before and after the crime, may be considered in determining whether the defendant has met his burden of proof on an insanity defense. Holder, supra.
In reviewing a claim of insufficiency of evidence in regard to a defense of insanity, this court applies the test. set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The appellate court, viewing the evidence in the light most favorable to the prosecution, determines whether any rational trier of fact could have found [¡¡that the defendant had not proved by a preponderance of the evidence that she was insane at the time of the offense. State v. Armstrong, 94-2950 (La.4/8/96), 671 So.2d 307; State v. Peters, 94-0283 (La.10/17/94), 643 So.2d 1222; State v. Sepulvado, 26,948 (La.App.2d Cir.5/10/95), 655 So.2d 623, writ denied, 95-1437 (La.11/13/95), 662 So.2d 465.
The determination of sanity is a factual matter reserved to the jury or other fact finder. Expert testimony is relevant to the issue of whether a defendant is insane, but even where experts opine that the defendant is insane, the issue is for the jury to decide. Sepulvado, supra. Th'e fact finder’s decision should not be overturned unless no rational juror could have found the defendant failed to prove his insanity at the time of the offense. State v. Sharp, 418 So.2d 1344 (La.1982); Holder, supra.
All evidence, including expert and lay testimony, besides the defendant’s conduct and actions, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony concerning the defendant’s actions, both before and after the crime, may give the fact finder a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Appacrombie, 33,551 (La.App.2d Cir.9/12/00), 766 So,2d 771, writ denied, - 00-2856 (La.10/5/01), 798 So.2d 961, citing State v. Horne, 28,327 (La.App.2d Cir.8/21/96), 697 So.2d 953, writ denied, 96-2345 (La,2/21/97), 688 So.2d 521.
[ fiAt trial, Carolyn Ann Butler testified that on the evening of December 21, 2012, she and her flaneé, Larry Patterson, returned to her home on Milton Street in Shreveport, to find Joseph eating noodles *184 at the kitchen table. • Patterson questioned Joseph about some missing socks and he replied that he was missing some socks as well. The argument escalated and the defendant told Patterson to “get the f— out of my face.” ' According- to Carolyn, Joseph left the kitchen and went to his room, but Patterson followed him.
Carolyn said that she walked back toward Joseph’s bedroom and saw Patterson holding a baseball bat. Then she saw her son grab a gun from his bed. She turned to leave and heard gunshots. Frightened, Carolyn quietly left the house. While she was trying to get into her car, she saw Joseph through the kitchen window, trying to open a package of noodle sauce. Carolyn drove down the. street to a school where she called her other son, Shreveport Police Officer Louis Butler, II, and told him that Joseph had shot Patterson.
After Joseph’s arrest, he called Carolyn from jail. Carolyn identified a telephone recording of a conversation between her and Joseph while he was in jail. The recording was played in open court.[2] During their conversation, Carolyn asked Joseph why hé shot Patterson. He responded that “he could only take so much” and that “it went to that level.” Neither Carolyn nor Joseph ever mentioned Patterson having a baseball bat during their telephone conversation. Carolyn admitted that she never mentioned to 17police or the grand jury that she saw Patterson with a baseball bat and had instead indicated that she remained in the kitchen before she left: She explained that she “didn’t remember” the other parts of her story (going to Joseph’s bedroom and the bat) because it “was such a shock to [her] to see what [she] saw.”. •
Carolyn explained that Patterson had been living with her and the defendant for approximately a year and a half. Patterson would tease Joseph and “slap box” with him, but they had a good relationship and were never physically violent to one another.
Carolyn also testified about ‘ Butler’s history of mental illness. Her son was diagnosed with schizophrenia and bipolar disorder when he was a teenager after sustaining injuries from an automobile accident in 1996. She said that after the accident" Butler was withdrawn, did a lot of aimless walking, talked to himself and stared at people. Carolyn recalled that he would just start laughing for no apparent reason. She testified that Butler once “poked” her and threw water at her without provocation. She did not think he remembered the incident. According to Carolyn, Joseph never threatened anyone, but would talk to himself and to things. He was treated for mental illness at several facilities,- including Louisiana State University Health Sciences Center (“LSUHSC”) in Shreveport.
At the time of Patterson’s death, the defendant was taking medication, administered by injection every two weeks, for his mental illness. He was due for his injection the week after the accident, and was current on his medication. Carolyn testified that when it got closé to the time when Butler | Swas due to receive his medication, his behavior would" change, his hygiene would deteriorate and he would have trouble sleeping.
Shreveport Police Officers Ryan Holly, Thomas LaValley and Kimberly McKenzie Harris responded- to Carolyn Butler’s house after the shooting and found Patterson, who had been shot in the head, lying on the floor in one of the bedrooms. The officers identified photographs • of the victim introduced into evidence. They did *185 not find a baseball bat or any other weapons in the house, but did discover shell casings next to Patterson’s body.
Dr. James Traylor, Jr., a forensic pathologist, conducted Patterson’s autopsy on December 22, 2012. Dr, Traylor noted that Patterson had received two gunshot wounds (one to the back and one to his head), but opined that Patterson died from the wound inflicted to his head. The soot and searing located on the entrance wound indicated that the gun barrel was directly against Patterson’s head when the fatal shot was fired. Patterson was also shot on the left side of his back. Dr. Traylor could not give an opinion as to which gunshot wound was inflicted first.
Dr. Colon, an expert forensic psychiatrist, testified at trial regarding his evaluation of Butler on September 5, 2013.[3] Dr. Colon reviewed Joseph’s Caddo Correctional Center records, his medical records from LSUHSC and Mind Rehabilitation and Resource Center, his Social Security Administration records and records from the pharmacy that prepared his medication. The records revealed that Butler had a long history of | ahospitalization and treatment for paranoid schizophrenia and/or schizoaffective disorder occurring after he sustained head injuries in an automobile accident in 1997. Dr. Colon explained that paranoid schizophrenics often have prominent and bizarre hallucinations or delusions, and can suffer from disorganized or irrational thinking or behavior. Dr. Colon noted that a person suffering from paranoid schizophrenia may be unable to distinguish right from wrong due to a hallucination or delusion, but others can. Butler’s medical records indicated that he was compliant with his medical treatment, received biweekly injections of the antipsy-chotic medication Risperdal, and was not suffering from hallucinations or- delusions at the time of the shooting.
Dr. Colon also interviewed Butler and found him to be “stable'.psychiatrically,” and very appropriáte for thé evaluation. Butler was articulate and able to recall the events that led to his arrest. He understood the concept of an insanity defense, knew that he had been charged with second degree murder for “shooting my mother’s boyfriend,” and recognized that he was facing a life sentence if convicted. Butler told Dr. Colon that he knew that “shooting someone is wrong/’ and felt that he was in his right mind..at the time of the shooting and knew right from wrong. Dr. Colon found that Butler “presented as someone who was compliant with outpatient treatment and stable psychiatrically even when he arrived at Caddo Correctional Center.” Dr. Colon’s diagnosis of was that Butler suffered from paranoid schizophrenia, but was stable on his medication. Dr; | inColon " opined’ that Butler had the capacity to distinguish right from wrong at the time of the shooting.
On cross-examination, Di\ Colon conceded that a patient can build a tolerance to psychiatric medications, which is why patients'are evaluated regularly. Dr. Colon did not feel that Butler was malingering his psychiatric symptoms. While housed at the Caddo Correctional Center prior to his trial, the defendant was receiving injections of Haldol, a medication comparable to Risperdal, which the correctional facility did not supply.
Corporal John Madjeriek, a crime scene investigator with the Shreveport Police Department, investigated the homicide scene. Corporal Madjeriek described the *186 scene, including a description of the victim and noted that there were six cartridge casings in the room where police discovered Patterson’s body. Referring to the photographs[4] taken of the scene, Corporal Madjerick testified that police did not find a baseball bat or any other weapons in Carolyn Butler’s home. He confirmed the existence of blood evidence at the scene. Two projectiles were recovered from the house and taken to the crime lab for analysis. A Hi-Point .45 caliber handgun was discovered on the roof of the garage at Carolyn Butler’s house and also sent to the crime lab for testing. DNA swabbings were conducted on the grip, slide area and magazine of the gun.
Corporal Madjerick saw Butler shortly after the shooting; he did not see any marks on him that indicated he had recently been involved in a fight |1Tor struggle. However, Butler had red stains on his shirt and pants that looked like blood.
Louis Butler, Sr., the defendant’s father, testified that Carolyn Butler called him shortly after the shooting and told him that “Joe Joe done killed Larry.” Butler, Sr., found his son with friends and drove him to the police station. When Butler, Sr., got out of his car and approached his son, Joseph told his father than he “had to shoot Larry,” because he could not get him to “stop messing with me, you know.” On the way, Butler, Sr., overheard his son on the phone with his mother and heard him again say that he killed Patterson because he was “messing with” him.
Louis Butler, Sr., confirmed his son’s mental illness issues. He recalled a prior violent outburst by the defendant where he broke all the windows in his mother’s car. When the father tried to intervene, Joseph attempted to hit him with a stick. Another time, shortly after Joseph was released from prison a few years ago, he went missing and his father found him talking to some dogs.
According to his father, the defendant had been to LSUHSC numerous times for his mental illness and was committed to an institution for six months due to his mental illness.
Butler, Sr., testified that Butler received his medication by injection every other Wednesday and that a few days before he was due for his next injection he would begin talking to himself frequently.
Dr. Seiden, a forensic psychiatrist appointed by the court to examine Butler, testified at trial regarding his evaluation on October 15, 2013. Prior 112to interviewing Butler, Dr. Seiden reviewed the defendant’s “extensive” medical records and police reports. Dr. Seiden explained that Butler had a long history of psychotic and mood symptoms and had a psychotic disorder for which he had been hospitalized on several occasions. The defendant’s mood symptoms included thoughts of suicide and death. Butler’s psychotic symptoms included delusions and hearing hallucinations. However, Butler told Dr. Seiden that prior to his most recent arrest he was receiving injections of the antipsychotic medication Risperdal and that the medication made him feel calm. According to Dr. Seiden, the medications treat the mental illness but do not cure it. One of the side effects of Risperdal can be akathisia, or motor restlessness, which may cause patients to pace or rock.
Dr. Seiden found Butler cooperative during his interview. Butler told Dr. Seiden that he got into an argument with *187 Patterson over whether the defendant was going to wash a pot and at some point he asked Patterson if he was drunk. Patterson threatened to choke Butler if he did not clean the pot and then pulled a knife on the defendant. Butler said that he then ran to his room to get his gun, but that Patterson followed him and pushed him, so the defendant shot him three times in the stomach and once in the head. Dr. Seiden did not think that Butler’s behavior stemmed from hallucination or delusion, but was in response to a disagreement with Patterson. Butler understood that murder was wrong because he said “I knew eventually there would be a warrant for my arrest,” and if convicted he could receive a life sentence.
|1sDr. Seiden explained that a person afflicted with schizophrenia or paranoid schizophrenia may still have the ability to discern right from wrong. In his opinion, Butler had the ability to know right from wrong at the time of Patterson’s murder, especially considering his “clear statement” that what he did was wrong and would be arrested for it. Additionally, Dr. Seiden testified that he found no evidence that Butler was suffering from any hallucinations or delusions at the time of the offense.
Naomi Johnson, the defendant’s sister and a registered nurse, testified on Butler’s behalf. She stated that she visited her mother and the defendant often and was aware that her brother suffered from schizophrenia and bipolar disorder for a number of years. Johnson said that Butler would start pacing, talking and laughing to himself, and staring when he needed his medication. Johnson never saw Butler and Patterson argue. In fact, Butler told Johnson that he loved Patterson and that he treated him well.
Johnson recalled several strange incidents with Butler occurring years before the homicide. For example, Johnson testified that approximately 10-15 years before, she saw her brother walking down the street naked. She yelled at him and he ran into their mother’s house. Another time, Johnson saw Butler by the side of the road holding a shoe, with one pant leg rolled up and with very messy hair. Nineteen years or so years before, the defendant bit her son on the face for no apparent reason. He also choked his grandmother close to 20 years before. There were instances many years before where her brother would laugh out loud inappropriately and refer to the photograph of a baby as his girlfriend. The most recent occurrence 114happened three or four years prior to the shooting, when Johnson saw Butler talking to what seemed to be an imaginary friend.
Following Johnson’s testimony, the defense introduced Butler’s medical, Social Security Administration and Caddo Correctional Center records into evidence and rested. Butler’s medical records confirm his history of schizophrenia and bipolar disorder. The jail records reveal that Butler was receiving Haldol in jail to treat symptoms related to his mental illness. Butler’s pharmacy records indicate that he was given an injection of Risperdal Consta every two weeks; the last injection was administered on December 12, 2012, nine days before the shooting.
When viewing this evidence in a light most favorable to the state, we find that a rational fact finder could-have reasonably determined that Butler failed to prove that he was insane at the time he shot and killed Patterson. After their examination of Butler, both Drs. Colon and Seiden concluded the defendant could distinguish between right and wrong at the time of the offense. Butler’s medical records confirm he was consistently receiving medication, Risperdal, by injection to control the *188 symptoms of his mental illness at the time he killed Patterson. He confided to Dr. Seiden during an interview that the Ris-perdal made him feel calm. Butler also told Dr. Seiden that he- knew there would be a warrant for his arrest for killing Patterson, which indicated to Dr, Seiden that the defendant knew that he had done something wrong, Futher, Butler told Dr. Colon that he was not suffering from hallucinations or delusions' when he killed Patterson and that he knew that “shooting someone is wrong.” Butler himself told the physicians that |1fihe was in his’right mind at the time of the shooting and could distinguish right from wrong.
Moreover, the testimony of the lay witnesses regarding Butler’s behavior did not provide the trial court with a rational basis for rejecting the unanimous medical opinion that the defendant was legally sane at the time of crime. Butler’s sister and father testified regarding strange behavior exhibited by the defendant years ago, not before or during the instant offense. Furthermore, the state’s evidence suggested Butler’s understanding that his actions were wrong at the time of the shooting. He attempted to conceal evidence by throwing the gun used to kill Patterson on the roof of his mother’s garage and left the scene. While the basis of the argument between Butler and Patterson may have been trivial, Butler’s statements to his mother' after the incident revealed that the argument escalated because Butler grew tired of Patterson’s “messing” with him and that he “could only take so much.”
This evidence supports tlie manslaughter verdict. Accordingly, these assignments of error are without merit.

Second Felony Offender Adjudication

Butler next argues that he should not have been adjudicated .a second felony offender because the state illegally used a prior theft conviction which was an enhancement of a prior conviction to prove his habitual offender status. He contends that the use of an enhancement to enhance another conviction constitutes double jeopardy.
11fiOn~ December 1, 2014, Butler filed a motion to quash the habitual offender bill arguing that since his conviction for theft of goods, second or subsequént offense, was an enhancement of á prior conviction, its use to prove his status as a habitual offender violated his right against double jeopardy. Nevertheless, on that date Butler’s habitual offender, hearing was conducted.[5]
After the hearing on December 3; 2014, the trial court granted Butler’s motion to quash the habitual bill of information on the basis of the double jeopardy claim. The state sought supervisory review of the trial court’s ruling and on January 29, 2015, this court granted the state’s writ application, reversed the trial court’s ruling and remanded the case to the trial court-for further proceedings (No. 49,929-KW). Specifically, this court explained that per State v. Baker, 06-2175 (La.10/16/07), 970 So.2d 948, cert. denied, 555 U.S. 830, 129 S.Ct. 39, 172 L.Ed.2d 49 (2008) and State v. Platt, 43,708 (La.App.2d Cir.12/3/08), 998 So.2d 864, writ denied, 09-0265 (La.11/6/09), 21 So.3d 305, the defendant’s prior conviction for felony theft .of goods, second or subsequent offense, could be used to enhance the defendant’s manslaughter sentence under La. R.S. 15:529.1, so long as the predicate offense underlying the felony theft convic *189 tion was not also independently used to enhance the manslaughter sentence,[6]
On May 27, 2015, the trial court adjudicated Butler a second' felony offender. Butler filed an objection to the determination in order to preserve 117for appeal his argument that his prior offense could not be used to prove'his status as an habitual offender.
.The Louisiana Supretne Court has helc[ that a sentence imposed, under La. R.S. 14:95.1, the statute prohibiting possession of firearms by convicted felons, may be enhanced under the habitual offender law, as long as the prior felony conviction used as an element in the possession of firearms conviction is not also used as a prior felony conviction in the habitual offender bill of information. Baker, supra. This court subsequently held that the use of the charge of possession of marijuana, second offense, was permitted as a predicate felony .in a habitual offender charge. Platt, supra.
The sentence for felony theft of goods, second or subsequent offense, is set forth in i La.. R.S. 14:67.10(B)(3) as follows in pertinent part:
If the offender in such cases has been convicted of theft or theft of goods two or more times previously, upon any subsequent conviction he shall be imprisoned, with or without hard labor, for not more than two years or may be fined not more than one thousand dollars, or both.
Initially we note that this issue was considered by this court when ..it reviewed the state’s writ application regarding the trial court’s ruling granting the defendant’s motion to quash the habitual bill of information. The law of the case doctrine provides that this court is not required to, but may in its discretion, revisit an issue on appeal that has previously been decided on a writ application. Robideau v. Johnson, 31,770 (La.App.2d Cir.3/31/99), 731 So.2d 955, writ denied, 99-1564 (La.9/17/99), 747 So.2d 562.
' 11 «Accordingly, upon a review of the full record on appeal, we maintain that Butler’s sentence for his manslaughter conviction was properly enhanced under La. R.S. 15:529.1(A)(1). As determined by Baker, supra and Platt, supra, the state properly utilized Butler’s prior conviction for theft) second or subsequent offense, to enhance the sentence for his instant manslaughter conviction under La. R.S. 15:529.1, because it did not also independently use the conviction underlying the theft, second or subsequent offense conviction (a misdemeanor), to enhance the sentence for the defendant’s manslaughter sentence.
Accordingly, this assignment is without merit.

Excessive Sentence

Butler argues that the trial court failed to sufficiently particularize the sentence to him given his mental health issues and the irrational nature of the crime. He argues that he did not commit the offense for monetary gain and that he has only one other conviction, simple battery, that is considered a crime of violence. Butler also argues that his sentence is unconstitutionally excessive.
On June 9,. 2015, Butler’s sentencing hearing was conducted. The trial court noted that it had reviewed all the documentation and statements by the parties regarding sentencing.[7] Further, the trial court considered the sentencing factors set *190 forth in La.C.Cr.P. art. 894.1, noting that the offense was committed with the use of fírearm and that the defendant had a criminal record. However, the trial court also emphasized Butler’s struggles with lamenta! illness. Based on the aforementioned facts, the trial court sentenced Butler to 28 years at hard labor without the-benefit of probation or suspension of sentence. As noted above, the court later removed the probation and suspension of sentence restrictions.
La. R.S. 15:529.1(A)(1) provides in pertinent part:
A. Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
(1) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment for any term less than his natural life, then the sentence to imprisonment shall be for a determinate term not less than one half the longest term and not more than twice the longest term prescribed for a first conviction.
The crime of manslaughter is punishable by imprisonment at hard labor for not less than 40 years. La. R.S. 14:31.
Butler was subject to a term of imprisonment for not less than 20 years and not more than 80 years as a second felony offender.
The test imposed by the. reviewing court in determining the exces-siveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Johnson, 48,320 (La.App. 2 Cir. 11/20/13), 127 So.3d 988; State v. Watson, 46,572 (La.App.2d Cir.9/21/11), 73 So.3d 471. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art.‘894.1. State v. Jones, 398 So.2d 1049 (La.1981); Johnson, supra; State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 08-2341 (La.5/15/09), 8 So.3d 581. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. There is no requirement that specific matters be given any particular weight at sentencing. Johnson, supra.
Second, a sentence violates La. Const, art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Shoupe, 46,395 (La.App. 2 Cir. 6/22/11), 71 So.3d 508, writ denied, 11-1634 (La.1/13/12), 77 So.3d 950. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 *191 So.2d 166; Johnson, supra; Shoupe, supra.
121The trial judge is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7; Shoupe, supra.
The record clearly reveals adequate 894.1 compliance by the trial court. In particular, the trial court noted Butler’s history of mental illness, his criminal record which included one crime of violence and the fact a firearm was used in the commission of the offense. Moreover, considering the facts of the case with the imposed sentence, including Butler’s mental illness history, we cannot find that this low-range punishment shocks the sense of justice. Butler’s actions caused the death of an unarmed man. The circumstances of this case fit the chosen punishment, which is not excessive.
Accordingly, this assignment is without merit.

Error Patent:

We note that Butler’s sentence should have been imposed without the benefit of probation or suspension of sentence per La. R.S. 15:529.1(G), which requires that any sentence imposed under the habitual offender law shall be at hard labor without the benefit of probation or suspension of sentence. Shoupe, supra. As discussed above, the trial court initially imposed Butler’s sentence without benefit of probation or suspension of sentence, but subsequently amended his sentence to delete the restriction.
An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. C.Cr.P. art. 122882(A). Further, an appellate court may notice sentencing errors as error patent. State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790.
Accordingly, by this opinion, we amend Butler’s sentence to provide that the sentence be served without the benefit of probation or suspension of sentence.

Decree

For the aforementioned reasons, Butler’s conviction and sentence, as amended, are affirmed.
CONVICTION AFFIRMED; SENTENCE AMENDED AND, AS AMENDED, AFFIRMED.

. Butler also filed a "Defendant’s Statement on Sentencing” requesting the trial court to impose a lenient sentence in his case given his mental illness and the absence of a criminal history for violent offenses.

. The DVD recording was admitted into evf-dence.

. Neither Dr. Colon's nor Dr. Seiden's reports regarding their evaluation of the defendant were admitted into evidence at trial.

. A diagram of the scene, several photographs and the cartridge casings were admitted into evidence.

. The parties agreed to move forward with thé hearing and have the trial court hold the defendant’s motion to quash in abeyance.

. The Louisiana Supreme Court denied review of this court’s' ruling as being untimely.

. Apparently, there was a victim impact hearing. The record does not contain the transcript of the hearing, nor does it contain any . written statements by the victim’s family.